CAROLINE M. KING *vs*. PHILO REMINGTON and others.

WILLIAM S. KING *vs*. PHILO REMINGTON and others.

October 9, 1886.

Conveyance to Creditor as Security, held to create a Trust—Disability of Trustee to Purchase such or other Property at Judgment, Mortgage, or Bankruptcy Sale.—K. owned a large quantity of real estate, and was largely indebted beyond his ability to pay at once without sacrificing the real estate. His wife also owned a large amount of real estate. June 15, 1875, the two conveyed the greater part of their real estate to R. by deeds absolute in terms. At the same time K. and R. executed an agreement in writing, acknowledging the conveyances to have been made as security for advances to K., made and to be made by R., and containing provisions in respect to future advances of money and credit, which R. covenanted to make, from which the purpose of the transaction appears to have been to enable K., by means of the advances so to be made, to pay off his debts, and save so much of his property as might remain after disposing of enough to reimburse R. for all advances made and to be made, and interest and expenses. The contract gave to R. peculiar powers with respect to the holding and disposition of the lands conveyed. *Held*, that this created such a relation of trust and confidence between the parties as disabled R. to purchase under judgments or mortgages, or bankruptcy proceedings, and hold against K., and for his own benefit, property of K., whether included in the deeds executed as security or not.

Bankruptcy—Interest of Bankrupt after Assignment.—A bankrupt's interest in his estate is not extinguished by the assignment in the bankruptcy proceedings to the assignee in bankruptcy.

Same—Bankrupt's Interest in Real Estate.—In respect to real estate, the interest remaining in the bankrupt after such assignment is, under our statute, in the nature of a reversion, subject to be defeated by a sale by the assignee.

Same—Assignee's Sale—Purchase by Trustee for Bankrupt—Jurisdiction of State Court.—The state courts have jurisdiction to determine that a purchaser at a sale by an assignee in bankruptcy stands in such relation to the bankrupt and the property that he will be charged as trustee for the latter in making the purchase.

| | |
|---|---|
| 36 | 15 |
| 39 | 142 |
| 36 | 15 |
| 44 | 253 |
| 36 | 15 |
| 45 | 344 |
| 45 | 536 |
| 36 | 15 |
| 47 | 199 |
| 36 | 15 |
| 48 | 98 |
| 49 | 179 |
| 36 | 15 |
| a79 | 333 |
| 79 | 334 |
| 36 | 15 |
| 85 | 5 |
| 85 | 154 |
| 85 | 437 |

**Partnership—Contract to Manage and Sell Lands.**—A certain contract construed, and *held* to create a partnership to manage and dispose of certain lands; and a purchase of the lands in the name of one of the partners, made simultaneously with the forming of the partnership, *held* to be a partnership transaction, so that notice of the rights of others in the lands had by one partner was notice to the other.

These actions were brought in the district court for Hennepin county, against Philo Remington and his wife, Louis F. Menage and his wife, and Robert S. Innes, and were tried together by *Young* and *Koon*, JJ., without a jury. In each case a judgment was ordered for plaintiff, a new trial was refused, and the defendants appealed.

*John M. Shaw* and *Albert L. Levi*, for all the appellants.

*Francis Kernan*, for appellant Philo Remington.

*Gordon E. Cole*, for appellants Louis F. Menage and wife.

*C. K. Davis* and *J. E. Miner*, for appellant R. S. Innes.

*Eugene M. Wilson, Ripley & Morrison, John B. Atwater*, and *John Van Voorhis*, for respondents.

GILFILLAN, C. J. These two cases grew out of the same transactions, and depend on the same condition of facts, and may be disposed of in the same opinion. The cases are very voluminous, and have been voluminously (and exhaustively) argued. The record in each case covers over 800 printed pages, and the briefs or arguments in both cases (they were argued together) cover 1,100 printed pages.

The facts, stating them as briefly as can be done and present the questions decided, are: On and prior to June 15, 1875, William S. King owned large quantities of land of great value in the counties of Hennepin and Meeker, in this state, and was largely indebted beyond his present means of paying, and suit had been brought against him, and his property in Hennepin county attached, upon a pretended claim for a very large amount. Caroline M. King, his wife, also owned a considerable amount of valuable real estate in the county of Hennepin. The lands were more or less incumbered with mortgage and judgment liens.

On the date mentioned the two Kings executed to Philo Remington three deeds, conveying to him absolutely, in terms, the greater part of the real estate of William S., and all the real estate of Caro-

line M. At the same time William S. and Remington executed a contract in writing, as follows:

"This agreement, made this fifteenth day of June, 1875, between Philo Remington, of the villiage of Ilion, county of Herkimer, state of New York, of the first part, and William S. King, of Minneapolis, of the state of Minnesota, of the second part, witnesseth that the said parties have agreed as follows: Whereas, on the day aforesaid, the said King and wife executed and delivered to the said Remington three several deeds of a large quantity of real estate situated in the counties of Hennepin and Meeker, in the state aforesaid, and which several deeds are each on record in the respective offices of the registers of the respective counties aforesaid, and said deeds and the records aforesaid are hereby referred to and form a part of this agreement, except that one of said deeds by mistake has inserted in it one 80-acre lot which had been sold and conveyed by said King, before the conveyance was executed, to William Windom, of the state aforesaid, and which was inserted by mistake, and which 80-acre lot forms no part of this contract. The aforesaid conveyances have been made to the said Remington to secure to him indebtedness which the said King owes to the said Remington, and for liabilities assumed by the said Remington, and for moneys already furnished to the said King at his request, and for moneys still to be advanced, and for liens and liabilities which exist on the lands so conveyed as aforesaid, at the time of the execution of the said conveyances as aforesaid. The several sums or items making up the respective amounts of the said liabilities so assumed as aforesaid, and the amount in items of the moneys already paid and advanced at the request of said King, appear upon a schedule marked 'A,' annexed to this instrument, and which forms a part thereof, and which forms a part of this contract; which said indebtedness amounts in all to about the sum of $80,000, aside from liens and judgments which exist on said lands at the date of this instrument, except some of the liens aforesaid, which have since already been paid. It is understood that the liens existing on the lands aforesaid conveyed, represented by outstanding mortgages, are to remain, and the conveyances aforesaid are taken by the said Remington subject to the same; which said liens appear upon the several abstracts

of title now in the possession of said Remington, which have been made for him, and which liens said Remington will be compelled to pay and assume, provided the conditions of this instrument are not complied with and fulfilled on the part of the said King. It is mutually agreed by and between the parties to this instrument that the said Remington is to still further furnish, in money or current funds, to the said King, about $53,000, which money is to be used in paying debts and liabilities of said King. The more pressing demands are to be first paid, and among said liabilities are judgments which are now liens on the lands aforesaid conveyed, or some part of the same.

"It is also further mutually agreed and understood by and between the parties to this instrument that said Remington will still further assume and give to said King his note or notes, to the amount of about $70,000, and it is understood that said note or notes are to be used to pay debts and liabilities of the said King, and that notes are to be taken at as long a time as practicable,—in three, six, and twelve months, or about that length of time.

"It is further mutually agreed that at all times when payments in cash are to be made, or a note or notes given, the said Remington shall be consulted, and shall have the right to make the application of the funds or notes to be used in the payment of the debts and liabilities of the said King; and it is further mutually agreed that none of the advances of money or notes hereinbefore referred to shall be made until the time for appealing expires, which is understood to be in thirty days after service of a certain order dismissing and vacating a lien created by an attachment previously issued against the property of the said King, in a suit brought against him by the Pacific Mail Steamship Company, in the court of common pleas in and for the county of Hennepin, in the state of Minnesota. It is understood that said lien is to be removed before such advances, or any part of them, are made, and the said claim of the said Pacific Mail Steamship Company is not to be paid by said Remington, or any part thereof, but the title to the said lands is to be free therefrom; and that is one of the conditions of this instrument.

"It is further understood and agreed, and the said King hereby

agrees to use any of his own funds or property, so far as he can, to pay any of his liabilities, and to refund to said Remington the money which he furnishes and pays, and the liabilities which he assumes, as fast as the said King can reasonably do so. And the said King also agrees to do the best he can to pay his own debts and liabilities at all times, and will honestly and faithfully exert himself so that the said Remington's advances, by note or otherwise, shall be as small as possible, and below the limit herein and hereby specified, if possible, and as small in amount as possible. It is also further mutually agreed that the said King is to exert and use his best endeavors to find purchasers and make sales of the said real estate hereby conveyed to the said Remington as fast as he can, and said Remington will convey the said title to the said purchaser or purchasers, or convey such title as he has; and any money realized by any such sale or sales is to be received by the said Remington, and applied by the said Remington, so far as the same will go, in the extinguishment and satisfaction of the indebtedness of the said King to the said Remington, as hereinbefore referred to; said Remington to make the said application of funds so received.

"It is further mutually agreed by and between said parties that said Remington may at any time, in his discretion, using his own judgment, under the advice of Amos H. Prescott, his attorney, at any time when his interest in his judgment requires it, sell all or any part of said property aforesaid conveyed to him, to refund, reimburse, and pay up each and all of the indebtedness and liabilities aforesaid, including interest, assumed and to be assumed, and said King hereby agrees to the same; and said King also agrees that all expenses of any character connected with the said business, including costs, expenses, and charges of Amos H. Prescott, his attorney and counsel, shall be taken out of the moneys so realized. And it is further mutually agreed that said Remington may at any time execute mortgage or mortgages on said real estate, or any part thereof, to reimburse himself in whole or in part for any of his advances under this agreement; and any mortgage now existing on said real estate, or any part thereof, may be released or discharged, and a new mortgage

given on the same or other of said lands under this agreement, if it should be necessary or advisable so to do.

"In witness whereof we have hereunto set our hands and seals the day and year above written.                    P. REMINGTON.    [Seal.]
                                                    "WM. S. KING.    [Seal.]

    "In presence of witnesses:
      "W. C. SQUIRE.
      "P. OSGOOD."

No consideration was paid for said conveyances, except as specified in said contract. The deeds were duly recorded, but the contract was not recorded. Subsequently, from time to time, Remington advanced to King, and in satisfying mortgage and judgment liens, and purchasing or acquiring title to lands of the Kings, some included and some not included in the deeds of June 15, 1875, under mortgage or judgment liens, amounts largely in excess of the amounts stipulated in the contract. Through these various transactions there became vested in Remington titles to various tracts of the lands, under liens and claims dating prior to June 15, 1875. It is unnecessary to state in detail these transactions, in some of which a roundabout course was taken to vest the titles in Remington. A large part of the trial was taken up in introducing evidence on the part of the plaintiffs, tending to show that such titles were vested in Remington, pursuant to agreements between him and William S. King, as additional security to that furnished by the conveyances of June 15, 1875, or to strengthen the security thus furnished, and to carry out the purposes of the transaction of that date, and the court found such to be the facts. The greater number of the assignments of error are based on objections to the competency of such evidence.

In November, 1877, William S. was, upon the petition of some of his creditors, adjudged a bankrupt, and his estate was duly assigned by the register in bankruptcy to J. C. Whitney, as assignee. King filed in the bankruptcy proceeding a schedule of his assets, including all his lands herein referred to, and also the lands of Caroline M., (without her knowledge or consent;) all of which lands were in the

schedule stated to have been conveyed to Remington as security for a claim of $275,000. In April, 1878, the assignee, pursuant to permission from the bankrupt court, sold at public auction King's right, title, and interest in the scheduled lands to Remington; the sale appearing to have been of all the lands in gross, and upon a bid by him of $25 for the whole.

After the transaction of June, 1875, William S. continued in the possession, control, and management of all the property until late in 1877, when, at his request, because of his failing health, Remington appointed as his (Remington's) agent the defendant Innes, to take possession of, hold, and manage the property. In February, 1878, Innes received possession from King, and, except as to the lands afterwards sold, remained in the possession, control, and management of the property to the time of the trial, receiving the rents, and paying taxes and the interest on mortgages. Before taking possession he was fully informed of the nature and purposes of the relations and transactions between the Kings and Remington.

Prior to January 31, 1882, Remington sold portions of the land. On that day he and his wife, Caroline A., by their attorney in fact, Innes, entered into a written contract with the defendant Menage, by which Remington agreed that, after Menage had made the payments and performed the covenants therein stipulated on his part to be made and performed, he would convey to him the lands therein described, being all the lands still unsold of the Kings hereinbefore referred to. Menage therein covenanted to pay Remington therefor $496,000, as follows: $60,000 on or before June 1, 1882; $25,000 on or before November 1, 1882; and $411,000 on or before January 1, 1887, and to pay all taxes and assessments. The conveyances were to be executed upon the payment of the $60,000 and the $25,000, and the execution by Menage of a mortgage on the lands to secure the $411,000 and interest. Provision was made for releases of parts of the land from the mortgage on payments, at specified rates per acre, of the parts released.

At the same time with the making of that contract, and as a part of the same transaction, Menage and Innes entered into a contract in writing, as follows, (Exhibit O:)

"Memorandum of agreement made this ——— day of January, 1882, between Louis F. Menage and Robert S. Innes, both of the city of Minneapolis, county of Hennepin, and state of Minnesota: Whereas, Louis F. Menage has this day purchased from Philo Remington, of Ilion, Herkimer county, New York, a certain tract of land containing 1,147 36-100 acres, more or less, for the sum of four hundred and ninety-six thousand dollars, ($496,000,)—for a more particular description of said lands, and of the terms of said purchase, reference is hereby made to that certain contract of sale of said lands of even date herewith, by and between said Remington and Menage; said contract being hereby made a part of this agreement,—L. F. Menage is to employ and pay S. S. Bull out of his share of the net proceeds as hereinafter set forth; and they are to manage, bargain, sell, and dispose of said land, with the advice and consent of said Innes; and said Innes is to use his best endeavors to secure a release or releases of said lands, or portions thereof, from the lien of the mortgages, amounting to $83,000, thereon, as aforesaid.

"Said Menage is to have the general management of said business; or in the event of his death or disability prior to the final completion of the said undertaking, then the said Bull shall be the general manager; and in case of the death or disability of the said Menage and Bull before the completion of the said undertaking, then the said Innes is to have the general management of the said property,—it being the intention that the survivors or survivor of the said parties, to the exclusion of heirs and personal representatives of said parties or any of them, shall carry on the said business to the final completion thereof.

"If any land be received in exchange for said above-described lands, or any part thereof, or connected therewith, the legal titles to said lands so taken shall vest in the name of said L. F. Menage as trustee for said Menage and Innes, and all mortgages, notes, or other papers, evidences of property, and any and all personal property obtained by means of the disposition of said lands as aforesaid, shall be taken in the name of said Menage, trustee, as aforesaid; but in case of his death or disability, then the deeds or personal property shall be taken in the name of Bull or Innes, as trustee, as provided above.

"The net proceeds arising from the sale of said aforesaid lands,—to wit, the balance left after paying the cost thereof as per the terms of purchase as aforesaid of said lands, and the expenses of the said undertaking, no salary or allowance being made as compensation for the personal services of either of said parties,—are to be divided in the following proportion : Said Innes is to have the one-third part, and said Menage is to have the remaining two-thirds part.

"It is understood that, as soon as the indebtedness to Philo Remington as aforesaid shall be paid, the property, real and personal, on hand or held by the said trustee as aforesaid, shall be divided between the said Menage and Innes as aforesaid.

"A book-keeper is to be employed to keep the books of L. F. Menage, trustee, as aforesaid, who shall render at any time when requested by any one of the said parties a complete statement, giving the details of any transaction or transactions connected with or pertaining to said business, and the books shall at all times be open to the inspection of the three parties hereinbefore mentioned,—Menage, Bull, and Innes.

"In witness whereof we have hereunto set our names and seals the day and year first above written.

"Signed, sealed, and delivered in presence of

"LOUIS F. MENAGE. [L. S.]
"ROBERT S. INNES. [L. S.] "

Nothing was paid on the aforesaid purchase at the time of making the contract, nor until after a sale of a portion of the lands by Menage, and the receipts from sales were in excess of payments by Menage. Conveyances were made to Menage of the land in parcels, from time to time, as he had opportunity to sell or mortgage, until November 1, 1883, when all that remained were conveyed to him, he executing to Remington a mortgage for $245,000, the remainder of the purchase price; which mortgage Remington assigned to Innes, to be held by him for the benefit of himself (Innes) and Caroline A. Remington, under a contract between him and Remington, made July 23, 1882, by which the latter agreed to pay Innes, for services rendered and to be rendered in managing his business in Minnesota, at

the rate of $5,000 per year during the term of such services, and also to convey or transfer to him by a quitclaim deed or bill of sale all the property received from King, or acquired in any way by the disposal of said property, left after payment of all the mortgages on it, and the payment to Remington, out of the proceeds of the property, of $383,037.12, with interest from January 1, 1882, and the expenses incident to the care and disposition of the property, and at the same time Innes agreed to transfer to Caroline A. one-half of the property that he might thus acquire.

Until all the lands had been conveyed to him, Menage had no actual notice or knowledge, except what was disclosed by the records, of any of the transactions prior to his purchase, nor of the relations between the Kings and Remington, nor that the former claimed any interest in the lands; and he believed the title to be absolute in Remington, and that he had a right to dispose of the lands.

Both in the briefs and on the oral arguments many questions that we do not think affect or are necessarily involved in the case were discussed at great length, and with great ability, on both sides. We do not attempt to decide those questions, but content ourselves with deciding those that dispose of the case.

The objections to evidence that we have alluded to were not well taken. It is no longer open to question in this state that it is competent to prove by parol that a deed absolute in terms was given as security, and it is the same whether the deed was executed by the person who claims the rights of a mortgagor, or, at his instance and on his behalf, by one who holds the legal title for him. *Fisk* v. *Stewart*, 24 Minn. 97. Nor does it matter what mode the parties, debtor and creditor, adopt for vesting the title in the latter, if it be done for the purpose of giving security to him. This covers also the claim that by the two deeds subsequent to June, 1875, Caroline M. released her equity of redemption. It was proper to prove by parol they were given for the same purpose as that of June 15, 1875, to wit, as security.

Of the main questions in the case, the first that occurs is, what was the character of the relations between the Kings and Remington created by the conveyances and contract of June 15, 1875? The ap-

pellants insist that those instruments created merely a mortgage with power to enforce the security by private sales of the lands, and that the relation between the parties was only that of mortgagors and mortgagee, with no other rights, duties, and disabilities than pertain to that relation. The respondents argue that they created a trust, and between the parties the relation of trustee and *cestui que trust;* or at any rate, if they did not create a valid statutory trust, they did vest a valid power in trust. As Remington's only right to the lands then conveyed was as security for his advances made and to be made, it would be immaterial whether the transaction was a mere mortgage, or a mortgage with a trust, or with a power in trust added, were it not for the acquiring by Remington of outstanding titles through execution and mortgage and bankruptcy sales, and the claim by appellants of the right to hold them adversely to plaintiff; for, whether the transaction be as claimed by plaintiffs or defendants, there is, unless it has been cut off by the titles thus acquired, a right to call Remington to account for sales made. And this is, in substance, an action for accounting, and not one to enforce the performance of any supposed trust, nor to test the validity of any act done under a supposed power in trust. But it is important to consider the character of the transaction far enough to ascertain whether it created such a relation between the parties as, according to the rules of equity jurisprudence, disabled Remington to acquire and hold, against the Kings, title to the property.

The rule which disables one occupying a confidential or fiduciary relation, in respect to property the subject of a sale, from purchasing for his own benefit, and regarding him as a trustee if he do purchase, is absolute, and looks to no other facts than the relation and the purchaser. "No fraud in fact need be shown by the *cestui que trust,* and no excuse will be heard from the trustee. The fact established, and the result inevitably follows." *Baldwin* v. *Allison,* 4 Minn. 11, (25.) The rule is entirely independent of the fact whether any fraud has intervened. It is to avoid the necessity of any such inquiry that the rule takes so general a form. *Jewett* v. *Miller,* 10 N. Y. 402, (65 Am. Dec. 751.) The general interests of society require it to be so, as no court is equal to the examination and ascertainment of the

truth in much the greater number of cases. *Ex parte James*, 8 Ves. 337. The rule stands on the moral obligation to refrain from placing one's self in relations which ordinarily excite a conflict between self-interest and integrity. *Michoud* v. *Girod*, 4 How. 503. It seeks to remove the temptation that might arise out of such a relation to serve one's self-interest at the expense of one's integrity and duty to another, by making it impossible to profit by yielding to the temptation. Nor is the application of the rule confined to a particular class of persons, as guardians, solicitors, attorneys, etc. It applies universally to all who come within its principle; which principle is that no party can be permitted to purchase an interest in property, and hold it for his own benefit, where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account, and for his individual use. *Greenlaw* v. *King*, 5 Jur. 18; *Van Epps* v. *Van Epps*, 9 Paige, 237. The duty in relation to the property need not be a legal one such as the law will enforce a performance of. If it be a moral duty, growing out of confidence and trust reposed by one and accepted by another in business relations and transactions, it is enough.

We will refer to a few cases in which it was applied, where there was no legal enforceable duty. In *Ex parte Burnell*, 7 Jur. 116, it was applied to the partner of an assignee in bankruptcy, to disable him to purchase and hold the bankrupt's estate sold by the assignee. In *Ex parte James*, 8 Ves. 337, and in *Ex parte Bennett*, 10 Ves. 381, to a solicitor for a commission in bankruptcy in respect to a sale by the commission. In *Poillon* v. *Martin*, 1 Sandf. Ch. 569, to the clerk of an attorney conducting a sale of the property. In *Duncomb* v. *New York, H. & N. R. Co.*, 84 N. Y. 190, to a director of a corporation purchasing its bonds. In *Case* v. *Carroll*, 35 N. Y. 385, to an attorney who had been consulted by an owner of land, on which there was a mortgage then being foreclosed by suit, in respect to how to obtain and use the mortgage to perfect her title. The attorney bought the mortgage, conducted the suit to a foreclosure, and bid in the property. The rule was held to apply. In *Gardner* v. *Ogden*, 22 N. Y. 327, (78 Am. Dec. 192,) to the clerk of a broker to sell real estate, who had access to the correspondence between his principal and the

vendor. In *Ex parte Hughes,* 6 Ves. 617, to a creditor of a bankrupt, he having been consulted as to the mode of sale by the assignee. In *Fulton* v. *Whitney,* 66 N. Y. 548, to the trustees of a fund created by will, purchasing at the foreclosure of a mortgage on real estate of the deceased, (not part of the trust fund,) as the deficiency on the foreclosure would be chargeable as a debt against the estate, and so might diminish the trust fund. In *Oliver* v. *Court,* 8 Price, 127, trustees to sell lands for payment of debts employed a land surveyor to measure and value the lands. He was assisted by his son, a land surveyor and auctioneer. The son acted as auctioneer at an attempt to sell the lands at auction, which failed for want of bidders, and he afterwards bought at private sale. It was held that the rule applied to him.

In none of these cases was there any legal trust, or legal enforceable duty in respect to the property, the subject of the sale. In each the person occupied a position because of which more or less confidence and trust was reposed in him in respect to the property, or by means of which he may have acquired information, or possessed some advantage in relation to it not common to others. It is against good conscience that one occupying such a position should make a profit to himself by use of the information or advantage which the confidence reposed in him gives him, to the prejudice, perhaps, of the person reposing such trust and confidence in him. It often happens that one, in his business transactions with another in respect to his property, is obliged to trust to the good faith and honesty of such other, imparts to him information in respect to the property, or gives him some power over it, solely because of the trust he necessarily reposes in him. In such a case the latter would not be permitted to defeat the purposes of the confidence reposed in him by dealing with the property on his own account.

It is clear that the transaction between the Kings and Remington of June 15, 1875, was more than a naked mortgage; that there was a purpose in it—an end to be accomplished by it—beyond a mere ordinary loan of money. From the instruments executed on that day it is apparent that King possessed a large amount of real estate of great value, and was embarrassed by debts, mortgages, and judgments, so that he could not handle it, and relieve himself from the embar-

rassments, and save any of the property, unless he procured large loans to pay off the debts threatening it. The general purpose of the transaction was clearly to enable him to do this by means of advances to be made by Remington, the latter to be reimbursed for his advances from proceeds of sales, which, the liens being removed, King would be in a situation to make. In a mere loan upon security given, the borrower gets his money, and the lender his security; the parties standing at arms-length, each looking out only for what he gets. In this transaction no fixed amount was to be loaned. Remington was to advance (no time for the making or repayment of the advances nor rate of interest being agreed on) *about* $53,000 in money, and *about* $70,000 in notes. The amounts to be advanced were to be determined, within those limits at least, by the necessities of the purpose they had in view. King was to exert himself so that the advances should be as small as possible, to use his best endeavors to find purchasers and make sales of the lands, by which means it was evidently expected he would be able to keep the amounts necessary for Remington to advance within the limits stated. The money and notes advanced were to be used only for a specific purpose, to wit, in paying debts and liabilities of King, and to Remington was reserved the right to make the application of the advances in paying such debts and liabilities; that is, to determine what debt or debts should be paid by any advances made. Upon sales made by King, Remington was to convey to the purchasers such title as he had, the proceeds to be received by him, and applied to the reimbursement of his advances. He was to sell, under the advice of an attorney named, whose charges were to be taken out of the proceeds, in order to reimburse himself for his advances. And to him was reserved the right, certainly unprecedented upon a mere loan and giving security for it, to execute a mortgage or mortgages upon the real estate, or any part of it, to reimburse himself, in whole or in part, for his advances; and also the right, instead of advancing money to pay off any then existing mortgage, to procure its release by executing a new mortgage on the same or other lands.

The general purpose of the transaction—that is, to save to King so much of his property as could be saved after payment of his debts— was not confined to the property conveyed as security by the deeds

of June 15, 1875. His debts to be paid were not only such as were liens on that property. They were his *"debts and liabilities"* generally, whether liens or not, with the single exception of the claim made by the Pacific Mail Steamship Company, the attachment for which was to be removed before any advances should be made; for unsecured debts might become liens on property not given as security, and thus tend to defeat their general purpose.

The instruments show clearly enough, without resorting to any other evidence, that King, being in danger of losing his property by means of his debts, applied to Remington to assist him in saving so much of it as could be saved after payment of his debts, and that Remington undertook to do so in the manner provided in the contract; the three conveyances being made to secure him for what he should do in that behalf, as well as for previous debts due from King to him. King placed himself wholly in the hands of Remington, not only by conveying to him, by deeds absolute in terms, so large an amount of his property, which thus passed beyond his power to use it in procuring money from any one else for the purpose in view, but because the application of the advances in money and notes was left to the judgment and discretion of the latter, and also because of the power given to incumber the property conveyed as security with mortgages. The accomplishment of the purpose in view was intrusted to the integrity and good faith of Remington.

We think there has seldom come before any court a case in which one man reposed in another so entire, absolute, and implicit confidence and trust as King reposed in Remington, with a view to the settlement of his affairs, the relieving himself from his pecuniary embarrassments, and the saving of so much of his property as could be saved after payment of his debts. It would be a strange commentary on the rule we have considered, to permit Remington to take advantage, for his own profit, of anything growing out of those embarrassments, whether judgment or mortgage liens or sales, or bankruptcy proceedings, that would tend to defeat the purpose for which the confidence and trust were so reposed in him. The rule would be a grave irony if such a case did not come within its operation.

But the defendants argue, in effect, that the rule only disables the

trustee to purchase and hold for himself property in which the *cestui que trust* has some interest.    If his interest has become extinct,—if the property has ceased to be his, and become absolutely the property of another,—the trustee may purchase from the latter, as he might if it had never belonged to the *cestui que trust;* and that, by the assignment to the assignee in bankruptcy, every interest of King in his property, and every right connected with it, passed absolutely to the assignee, as effectually as upon a transfer by King himself; so that thereafter he had no right, title, or interest,—nothing that the law would regard as property; and that the sale by the assignee was not a sale of anything belonging to King, but only of the property of the assignee.

Assuming that the first of these propositions would be applicable to a case like this, we will consider the second; that is, that the assignment to the assignee in bankruptcy operated, without a sale by the assignee, to divest King absolutely of all right, title, and interest in his property, so that at the time of the sale he had no right, title, or interest to be affected by it.    In a good many cases, the courts, in discussing particular questions as to the *status* of a bankrupt, use the expression that, after the petition filed, he may, so far as regards the disposition of his property, and the control of suits pending against him, be regarded as *"civiliter mortuus."*    But the cases *In re Anderson*, 9 N. B. R. 360; *Ex parte Sheffield*, 10 Ch. Div. 434; *Bartlett* v. *Teah*, 1 Fed. Rep. 768, are the only cases we have been able to find in which the court seems to have acted on the proposition where the question directly before it was whether the bankrupt has, after the assignment, any interest in the property recognizable in law.

In *Reynolds* v. *Crawfordsville Bank*, 112 U. S. 405, (5 Sup. Ct. Rep. 213,) it was held that, no debts having been proved, and the bankrupt having been discharged, and the estate settled by the assignee, though there was no reconveyance, the bankrupt's quitclaim deed passed an equitable title; the court saying: "It was apparent that the appellant [bankrupt] was entitled in equity to all his estate in bankruptcy not required for payment of his debts."    In this case the assignee quitclaimed to the bankrupt after the latter had quitclaimed to the appellant.

In *Steene* v. *Aylesworth,* 18 Conn. 244, and *Cromwell* v. *Comegys,* 7 Ala. 498, it was held that, by reason of his interest, the bankrupt was, unless he released, incompetent as a witness for the assignee to prove a debt due the bankrupt.

In *Saunders* v. *Mitchell,* 61 Miss. 321, it was held that his interest in his land descended to his heirs, the court saying: "Since the law makes no provision for a reconveyance of the estate, and the bankrupt is the only party entitled thereto on the execution of the purposes for which it is taken, it seems to us that there is a reverter of the original title to the bankrupt by operation of law."

In *Page* v. *Waring,* 76 N. Y. 463, it was held that the bankrupt's estate vests in the assignee, by operation of law, without any conveyance, as trustee for the creditors, and, after payment of debts, as trustee for the bankrupt, and, no debts having been proved, it reverted to and vested again in the bankrupt by operation of law.

"After the debts are paid, the assignee is a trustee for the bankrupt." *In re Hoyt,* 3 N. B. R. 55.

In *Colie* v. *Jamison,* 4 Hun, 284, J. conveyed an alley, reserving the right to use the same so long as he should own an adjoining lot. He subsequently went into bankruptcy, was discharged, and the assignee reconveyed to him. It was not denied that, if his ownership of the lot ceased for a moment, the right reserved was gone. The court held that the proceedings did not terminate his title, saying: "The transfer to the assignee was merely nominal and official. He took no beneficial interest whatever. The title was vested in him, as an officer of the court, for the mere purpose of administration under the order and direction of the court."

In *Power* v. *Hollman,* 2 Watts, 218, it was held that, after the debts are paid, the bankrupt may maintain ejectment for his real estate without a formal reconveyance by the assignee.

In *Charman* v. *Charman,* 14 Ves. 580, it was held that bankruptcy proceedings did not revoke a devise of real estate, the bankrupt having died without a discharge, but the debts being paid; and that, after payment of the debts, the assignee holds as mere trustee for the bankrupt. And in *Lautour* v. *Holcombe,* 8 Sim. 76, that a bankrupt, though not discharged, all debts being paid, may maintain an action

to set aside a fraudulent conveyance of his property made by the as-signee. And in *Preston* v. *Wilson*, 5 Hare, 185, that, having settled with his creditors, he may maintain an action to redeem from a mort-gage executed by him before the bankruptcy.

In *Steevens* v. *Earles*, 25 Mich. 40, the bankrupt had been dis-charged, no debts proved, and the law repealed, but there was no re-conveyance. It was held his heirs could recover the real estate. In that case the court said: "It can make no special difference whether the rights of the assignees are regarded as powers or as trusts. In most respects they are quite analogous to the former. But their nat-ure is not important, for they were broad enough to dispose of all the property if such disposal was needed. Under our statute the rights of the bankrupt to what remained to him as surplus would be the same in either case, whether regarded as the residuum of a trust, or as a title discharged of the burden of a power of disposal. The act of congress makes no provision for a reconveyance, and the dis-charge of an assignee would make it practically impossible. The title must be somewhere, and under these circumstances it is neces-sary to regard it as in the only party interested."

The estate of the assignee in bankruptcy is similar in all respects, except in its inception, to that of an assignee in a voluntary assign-ment for the payment of debts. The purpose is the same. The conveyance to the latter may be as absolute and unconditional as that to the former. There is implied in the latter a reversion of any residuum after the purposes of the assignment are accomplished. It reverts by operation of law without any provision for it in the instru-ment of assignment. *Wintringham* v. *Lafoy*, 7 Cow. 738; *Van Ros-sum* v. *Walker*, 11 Barb. 237; *Ely* v. *Cook*, 18 Barb. 612; *Curtis* v. *Leavitt*, 15 N. Y. 9; *Ross* v. *McJunkin*, 14 Serg. & R. 364. "Such a residuary interest necessarily arises in every case where property is assigned in trust to pay debts or to satisfy other specified objects." *Wilkes* v. *Ferris*, 5 John. 335, (4 Am. Dec. 364.) ·

The assignment to the assignee in bankruptcy gives him no ben-eficial interest. His title is only official. It is made to him, not as an individual, but only as the officer of the court, to enable him, under the direction of the court, to sell it, if it shall be necessary,

and appropriate the proceeds to payment of debts. His official title must of necessity cease when his official character ceases. If the proceedings should terminate before a sale by him, either by their being fully closed, or by discontinuance, or by repeal of the law, or in any other manner, what becomes of the property, real and personal, in the absence of a retransfer by him to the bankrupt? He cannot hold and dispose of it as an individual, for he has no individual title; nor as an officer, for his official character has terminated. It must of necessity revert to the bankrupt, he being reinstated in his original title. It must be the same whenever the purposes of the assignment are fully accomplished. Both upon reason and weight of authority this is so, as much so as though it were expressed in the assignment. In respect to real estate, the right remaining in the bankrupt upon the assignment to the assignee may be classified under our statute as a reversion, (Gen. St. 1878, c. 45, § 12,) subject to be defeated by a sale by the assignee, (section 33.)

It is objected by appellants that the state courts have no jurisdiction to determine the matters involved in the cases. This seems to be based on the idea that there is involved some matter passed on by the bankrupt court, and that as to such matter the actions are to review, revise, or amend some decision, order, or decree of that court. The bankrupt court determines that the bankrupt's lands shall be sold, but it does not assume to determine what his interest in the lands may be. It orders sold whatever interest he has; what that interest is,—what the purchaser at the sale gets—is to be determined afterwards, by any court before which the question may come. For instance, had some person other than Remington purchased at this sale, the latter could have claimed the lands, or some interest therein, and could have brought the claim before any court competent to try such claims; and the order of sale of the bankrupt court would have no effect on the claim, either in favor of or against any one; for the relations in respect to the lands between the bankrupt and Remington, the interest in the lands, the rights, duties, and obligations of the latter in respect to them, were not before that court for determination, and it did not pass on them. When that court confirmed the

sale it did not pass on the question whether he purchased for himself, or for some one else, or whether he or some one else should have the benefit of the purchase, or any rights, duties, or obligations between him and some one else, for no such matters were before it. Suppose, prior to the sale, he had bound himself to purchase for and as the agent of some other person, or that he had made a binding contract to convey the lands, or that he had executed a conveyance of them with covenant of warranty, would the orders of sale or confirmation stand in the way of such principal or vendee or covenantee enforcing his rights? Surely not, for the bankrupt court did not and could not pass on such rights. The bankrupt could purchase at the sale, or have some one purchase for him. What the relations between him and any purchaser might be, and whether such that the purchase would inure to his benefit, could not be determined by that court.

In *Fulton* v. *Whitney*, 66 N. Y. 548, and *Bennett* v. *Austin*, 81 N. Y. 308, although the decree under which the sale was made expressly provided that any person might become the purchaser, the rule that one standing in a fiduciary relation is held to purchase for his *cestui que trust* (at the election of the latter) was enforced against the purchaser, because the equities between the trustees and *cestui que trust* were not before the court making the decrees.

The objection is not well taken.

In respect to the sale in bankruptcy, there are some considerations affecting the case of Caroline M. that do not apply to the case of William S. In his schedules in bankruptcy he (without her consent) included her lands. This, of course, could not affect her interests; and any sale of such lands merely because they were in the schedules, and supposed to be his, would amount to nothing. But the appellants claim that some of the lands once belonged to William S., and were by him conveyed (indirectly) to her for the purpose of defrauding his creditors, and that as to such creditors such lands remained his in law, and that consequently they could be sold as his in the bankruptcy proceedings; and that some of the lands, the title never having been in him, were conveyed to her by other persons upon a consideration paid by him, and as to such lands a resulting trust arose

in favor of creditors which could be and was enforced by the sale in bankruptcy.

As to those lands, the title to which was once in him, and which he (indirectly) conveyed to her, it is enough to say that in such cases the creditor alleging the conveyance to have been fraudulent must prove it, and the court below has, in substance, found that the conveyances were not fraudulent. We see nothing in the evidence to require a contrary finding. As to those lands the right to sell in bankruptcy was not shown.

As to those paid for by him, and conveyed to her, the title vested in her, and no trust resulted to him. Gen. St. 1878, *c.* 43, § 7. But (section 8) such conveyance was presumed fraudulent as to his creditors *at that time*, and, if fraudulent in fact, a trust resulted in favor of such creditors "*to the extent necessary to satisfy their just demands;*" and, to rebut the statutory presumption, it would be necessary for her, when properly called on, to disprove the fraudulent intent. The trust, if any, however, resulted only in favor of creditors *at that time*, —not subsequent creditors. None but creditors at that time can insist upon or enforce the trust, and, if it were proper to enforce it by seizure and sale instead of by suit, such seizure and sale should be on behalf of such creditors. It could not be done solely on behalf of other creditors. A sale in bankruptcy is not on behalf of creditors generally, but only of those who prove their debts. The bankrupt court will pay no others. It is not found as a fact, and we find no evidence of the fact, that any creditor *at the time* when William S. paid the consideration, or the conveyance was made, proved his debt in the bankruptcy proceedings. It does not appear that the sale was made on behalf of any such creditor. It has also been decided by this court that the trust, under section 7, must be enforced by suit, and cannot be enforced merely by seizure and sale. So that nothing could pass by the sale in bankruptcy so far as the lands of Caroline M. were concerned.

It is not claimed that the sale to Menage was pursuant to or that it was authorized by the transaction of June 15, 1875. The appellants plant themselves squarely on a denial of all obligations under it, and justify the sale on their claim that Remington was absolute

owner of the property. The right to maintain the action against the Remingtons is established, and also, because of his knowledge of all the facts, against Innes.

It remains to be considered whether it can be maintained against Menage. That, of course, depends on whether he is to be regarded as a *bona fide* purchaser. As he had no actual personal notice or knowledge of the rights of the Kings, nor constructive notice by the records, he was not deprived of the character of a *bona fide* purchaser by notice unless he is chargeable with it by reason of his relations with Innes at the time of the purchase. Any subsequent relations with Innes would not charge him with the notice that the latter had. If, for instance, there were then no relations between them other than that of parties contracting, the one to sell and the other to buy, and he bought for himself, the rights acquired by him in the purchase would not be impaired by his subsequently forming a partnership with Innes, with the land as the subject of the partnership enterprise.

The questions involved in the point are two: *First.* Did the contract between Innes and Menage, of January 31, 1882, constitute them partners? *Second.* Was the purchase of the lands of that date a partnership purchase, made on its behalf and for its purposes?

No one at this day can doubt that partnerships may be formed for the purpose of trading or speculating in land, either in lands generally, or in specified lands. Where two or more persons combine their capital, labor, or skill for the purpose of dealing in lands generally, or in specific lands, for their common benefit, a partnership is formed. The management, sale, and disposal of the lands that day purchased from Remington was the enterprise upon which Innes and Menage, by their contract of January 31, 1882, expressly agreed to enter. Menage and Bull were to manage, bargain, sell, and dispose of the lands with the advice and consent of Innes; and, to enable them to do this, the latter was to use his best endeavors to secure a release or releases of the lands, or portions thereof, from the liens of mortgages on them; the title to all lands received in exchange for said lands, and of all mortgages, notes, or other papers, evidences of property, and of any and all personal property obtained by means of dis-

posing. of the lands, to be taken in the name of Menage, and, in case of his death or disability, in the name of Bull, and, in case of death or disability of both of them, in the name of Innes, in trust for the two contracting parties; a survivorship in the legal title and manage-· ment being provided, for the exclusion of heirs and personal repre-sentatives of the parties. Menage was to have the *general* manage-ment of the business. In case of his death or disability, then Bull was to be the general manager; and in case of the death or disabil-ity of both of them, then Innes was to have the general management. But, notwithstanding the provisions as to the *general* management, the conduct of it was to be with the advice and consent of Innes. The profits of the entire venture—that is, the proceeds, after deduct-ing the purchase cost of the lands and the expenses of the undertak-ing, no compensation being allowed for the personal services of either party—were to be divided between the parties. Books of account were to be kept, to be all times open to the inspection of Innes, Men-age, and Bull. Bull's place in the business seems to have been in-tended as that of a sort of assistant or representative of Menage. Al-though the contract does not expressly designate the relation between the parties formed by it,—does not use the term "partnership" or "partner,"—it did undoubtedly create a partnership to deal in the lands. There is not a provision in it, unless perhaps the bringing in of Bull as the assistant or representative of Menage, that might not be expected in any contract for such a partnership. All were pecul-iarly appropriate to such a contract. There was a combination of capital, labor, and skill in a common enterprise, for their common benefit. When we take into consideration the previous relations of Innes to the property, the character of the two contracts of January 31, 1882, the facts that they were executed at the same time, and as parts of the same transaction, as found by the court below, (and this finding is abundantly sustained by the evidence; for the testimony of Innes, uncontradicted, is to the effect, not only that the two con-tracts were executed at the same time, but that it was the under-standing prior to their execution that he was to have an interest in the purchase; in other words, that the purchase was made for the benefit of himself and Menage, as they agreed upon in their contract,)

it is clear that the purchase was a partnership purchase, made for the purposes of the partnership.

It is a little hard to conceive of a man being seller and buyer, at the same time acting as agent for the owner in making the sale, and being a partner in the purchase.   But Innes certainly put himself in that position.   Whatever he did connected with the purchase was undoubtedly a part of his contribution to the partnership undertaking. But for the partnership formed to manage and dispose of the lands, there would have been no purchase; and but for the purchase agreed on, no partnership would have been formed.   The instant the contract of purchase was executed it inured to the benefit of the partnership. The parties—the sole actors in the sale and purchase, Innes and Menage—intended that result.   The purchase, therefore, though in form by Menage, was in substance and effect by the partnership, and the rights secured by it were intended to become, and did become, at once, partnership property as fully as though 'Innes and Menage, as partners, had been named as the purchasers.   Being a partnership act, notice had by either partner affected both.

Orders affirmed.