IVER J. BOYUM v. J. F. JORDAN AND OTHERS.[1]

June 4, 1920.

No. 21,688.

**Trustee cannot derive personal profit from his trust.**

1. An assignee or trustee is not permitted to derive a personal profit from his management of the trust property or his dealings with it.

**Assignment for benefit of creditors — debtor estopped from making claim against assignee.**

2. Where a debtor assigns his property to three trustees for the benefit of creditors, and after a so-called bankrupt sale the residue of the merchandise is offered for sale in a lump, and the highest offer therefor is made by a party who has arranged with one of the trustees to furnish the money to make the purchase for a share of the profits, and this trustee informs the debtor that if the sale is made he will be interested in it and may derive a profit from it, and for that reason desires the debtor to determine for himself whether the sale shall be made without being influenced in any manner by the trustee, and the debtor directs that the sale be made, and the price received is the full

1Reported in 178 N. W. 158.

value of the goods, the debtor is not in position to invoke the rule that a trustee cannot be interested in the purchase of trust property.

**Same — avoided by any preference of debtor over creditors.**

3. An assignment for the benefit of creditors is an absolute appropriation of the property to the payment of the debts, and any provision for the benefit of the debtor before the debts are fully paid will avoid it.

**Compromise with creditors — purchase of claims at a discount.**

4. A provision in the deed authorizing a compromise with creditors, or an agreement between assignor and assignee to purchase claims at a discount is illegal.

**Creditors' rights cannot be impaired by assignor or assignee.**

5. The creditors are the beneficiaries of the trust and have a vested interest in the property and its proceeds which cannot be changed or impaired by the assignor or assignee.

**Assignee's duty to the creditors.**

6. It is the duty of the assignee to pay the debts to the full extent that the property will permit, and he must not be a party to any arrangement which will create a temptation to misrepresent the state of the assets to the creditors.

**Creditors and not assignor have right of action.**

7. Where the assignor procured a third party to furnish the funds and buy up claims under an agreement to divide the discounts obtained, knowing that the third party must obtain his funds from others, and this agreement was carried out, and the third party procured the funds from a trustee under an agreement by which he paid the trustee a part of his share of the discount, whatever right of action may exist against the trustee rests in the creditors and not in the assignor.

**Same.**

8. Where a trustee receives a profit other than interest on his money by furnishing his own funds to a third party to buy up the claims of creditors, he violates his duty to such creditors and they, and not the assignor, have the right to call him to account.

Action in the district court for Otter Tail county for an accounting. The facts are stated in the opinion. The case was tried before Roeser, J., who made findings and ordered judgment in favor of defendants. Plaintiff's motion for amended findings was denied. From an order denying his motion for a new trial, plaintiff appealed. Affirmed.

*Leonard Ericksson,* for appellant.

*N. F. Field, Hilton & Thompson, Dodge & Webber* and *George W. Frankberg,* for respondents.

TAYLOR, C.

The Fergus Falls Woolen Mills Company, being unable to pay its debts as they became due, on December 23, 1913, conveyed all its property to Elmer E. Adams, A. G. Anderson and J. F. Jordan in trust for the benefit of its creditors. Mr. Adams was president of the First National Bank of Fergus Falls. Mr. Anderson was cashier of the Scandia State Bank of that city and a stockholder of the company, and Mr. Jordan was the credit man of Wyman-Partridge and Company, one of the largest creditors of the company. The trustees converted the merchandise received from the company into money, satisfied and discharged all the liabilities of the company, and in June, 1914, turned the manufacturing plant back to the company free from debt, and also turned back to the company something over $6,000 in cash, some raw material and a considerable quantity of uncollected accounts. In 1918, plaintiff, as a stockholder of the company, brought this action on behalf of the company to recover profits which he alleged that the trustees had made out of dealings with the trust property, and also to recover back the compensation received by the trustees for their services. He made the company, its officers and the trustees, defendants. The company and its officers interposed an answer setting forth that plaintiff had made a demand on the board of directors to bring the action; that after due consideration the board of directors had decided that the company had no cause of action against the trustees and had refused to bring the action; that the board of directors had ratified and approved all the acts and doings of the trustees, and that none of the trustees had been guilty of any wrongful acts. Each of the trustees interposed a separate answer, putting in issue all charges of wrongdoing. The evidence is voluminous. The court made findings of fact to the effect that plaintiff's charges were unfounded and directed judgment for defendants. Plaintiff appealed from an order denying a new trial.

Plaintiff relies on the long established and universally recognized rule that an assignee or trustee is not permitted to derive a personal

profit from his management of the trust property or his dealings with it. This rule has always been recognized and applied in this state. Baldwin v. Allison, 4 Minn. 11 (25); King v. Remington, 36 Minn. 15, 29 N. W. 352; Lewis v. Welch, 47 Minn. 193, 48 N. W. 608, 49 N. W. 665; Donahue v. Quackenbush, 62 Minn. 132, 64 N. W. 141; Gilbert v. Hewetson, 79 Minn. 326, 82 N. W. 655, 79 Am. St. 486; St. Paul Trust Co. v. Strong, 85 Minn. 1, 88 N. W. 256; Turner v. Fryberger, 94 Minn. 433, 103 N. W. 217, 110 Am. St. 375; Arnold v. Smith, 121 Minn. 116, 140 N. W. 748.

Defendants do not question the rule, but claim that the facts do not bring the present case within the principle enforced by the rule. As the findings are in favor of the defendants we must take the view of the evidence most favorable to them.

After the assignment, the trustees handled the affairs of the company much as if they had simply become its business managers and seem to have accorded to the board of directors the right to pass upon and approve or disapprove any action proposed to be taken, and the court finds that they agreed with the board not to dispose of any property of the company without the consent of the board. Whenever a question of importance arose they submitted it to the board for decision, and seem to have taken such decision as controlling and to have carried it into effect as if the board had full authority to determine the matter.

The profits in controversy consist of three items received by trustee Adams: (1) The sum of $804 realized by him from his dealings with Robert Hannah; (2) the sum of $1,672.76 realized by him from his dealings with W. B. Windsor; and (3) the sum of $5,944.87 realized by him from his dealings with H. K. Grinager.

The court found: "That said trustees have in all things performed the duties of their trust in a careful, faithful and efficient manner, and that the amount charged by them for their services is reasonable. That defendant Adams has not made any secret profits at the expense of the cestui que trust, and that the corporation, through its stockholders and officers, has had full knowledge and notice of all actions of said trustees, and has approved, ratified and confirmed all of said actions and doings."

The liabilities of the company at the time of the execution of the trust deed were above $113,000, and the assets were sufficient to pay all

liabilities in full. The company had a manufacturing plant at Fergus Falls, in which it manufactured woolen goods, and also had and operated a number of stores in Minnesota and North Dakota. The trustees pressed sales at these stores for a time and then closed out some of the stores by selling the residue of the stock in bulk, and the others by removing such residue to Fergus Falls. They conducted a so-called bankrupt sale at Fergus Falls for more than a month. After this sale they sought offers for the residue of the merchandise on hand.

H. K. Grinager was engaged in business in Fergus Falls as a jobber and manufacturer of woolen goods. Defendant Adams induced Grinager to make an offer for this unsold merchandise by agreeing to furnish the money to make the purchase and to join with him in handling the goods for one-half the profits. After making this arrangement Adams mailed to the president of the company the following letter:

"May 26, 1914.

"To the Board of Directors of the Fergus Falls Woolen Mills Company:

"A proposition is before your body from Mr. H. K. Grinager to purchase the goods now on hand and to lease the mill. In view of the fact that Mr. Grinager is relying on me to assist him in financing the transaction, if it is made, I desire to take no part or influence you in any way as to whether you should accept or decline the offer.

"As there might possibly be a profit to me in case I help him finance the matter, I desire to be relieved from all responsibility as a trustee in determining whether his offer shall be accepted."

He also notified the secretary of the company to the same effect verbally.

Mr. Grinager made an offer for the goods of 40 per centum of the invoice price and coupled with it a proposition to lease the plant with an option to purchase it, which offer was presented to the board of directors. The directors called a meeting of the stockholders and submitted the proposition to them. The stockholders opposed the giving of an option to purchase the plant and considered the offer for the goods too low, and recommended, perhaps informally, that new bids be obtained for the goods alone. While the records of the various directors' and stockholders' meetings seem to have been received in evidence as exhibits, these exhibits are not returned here and we are left to find out

the action taken by these bodies from the references to it in the testimony which are not always specific or clear. At the instance of the secretary, parties interested in the company formed a syndicate to bid on the goods. This syndicate made an offer of 45 per centum for them which was also presented at the stockholders' meeting. As the result of that meeting this bid and the Grinager bid were both rejected and the board of directors, apparently acting on the suggestion of the stockholders, adopted a motion advising the trustees to proceed anew to make a sale of the goods. Thereupon Mr. Grinager and the syndicate raised each other's bids until Mr. Grinager offered 48 ½ per centum for them. This, being the highest offer received, was approved by the directors after consulting with a number of the stockholders, and upon being advised of such approval the trustees accepted the offer and completed the sale. The sale amounted to the sum of $31,-733.71. A check for $1,000 had been submitted with the bid and the balance was paid on June 19, 1919. Immediately after this payment all unsatisfied debts of the company were satisfied and discharged, and the remaining property was turned back to the company free from debt, thereby terminating the trust as fully completed.

Defendant Adams furnished Grinager the money to purchase the goods. He and Grinager took possession of them, rented the mill for a few months and completed the manufacture of the partially manufactured articles, opened and conducted two stores, purchased other goods from wholesalers to stock these stores, and after operating their business for about a year closed it out. They were to share equally in the profits and losses. Out of all their transactions they realized a profit of $5,944.87 each. Their evidence is to the effect that these profits were realized from the goods which they manufactured or purchased from wholesalers, and that they made no profit from the goods obtained from the company, and there is no evidence, at least no direct evidence, to the contrary. The court found that they paid full value for the goods obtained from the company and the evidence fully sustains this finding. Among other things, the secretary of the company, who was one of the active members of the syndicate which presented the opposing bids, testified that they did not raise Grinager's final bid,

because they thought that their own previous offer of 47 per centum was all that the goods were worth.

The legal title to the goods was in the trustees and they passed it to Grinager. Thus in a legal sense the sale was made by the trustees, but to all intents and purposes it was made by the company through its board of directors. After Mr. Adams had informed the board that Mr. Grinager was relying on him for funds, and that he might make a profit in case of a sale to Mr. Grinager, and for that reason desired to influence them in no way and to be relieved from all responsibility as a trustee in determining the matter, the directors authorized the sale. The trustees made the sale not of their own volition, but to carry into effect the decision of the directors.

"A cestui que trust cannot allege that to be a breach of trust which has been done under his own sanction, whether by previous consent or subsequent ratification. Either concurrence in the act or acquiescence without original concurrence will relieve the trustee from responsibility to the beneficiary." Turner v. Fryberger, 99 Minn. 236, 107 N. W. 1133, 109 N. W. 229.

Insofar as the corporation is concerned, and plaintiff has no greater rights than the corporation, the sale in question was within the rule announced in the Turner case and valid, even if profits had been realized from these goods, which is neither found as a fact nor established by the record. See also Garceau v. McNamara, 125 Minn. 130, 145 N. W. 809; Mareck v. Minneapolis Trust Co. 74 Minn. 538, 77 N. W. 428; White v. Iselin, 26 Minn. 487, 5 N. W. 359; Ungrich v. Ungrich, 141 App. Div. 485, 126 N. Y. Supp. 419, affirmed without opinion in 207 N. Y. 662; Warren v. Pazolt, 203 Mass. 328, 89 N. E. 381.

As a large part of plaintiff's brief and argument is based on an apparent misconception of the rights and duties created by an assignment for the benefit of creditors, it may be well to refer to some of them briefly. Plaintiff seems to assume that the company was the beneficiary of the trust rather than the creditors, and one of his principal complaints against the trustees is that they refused to use the trust funds for the purpose of compounding with the creditors or of buying up the claims of creditors for the benefit of the company.

An assignment for the benefit of creditors is an absolute appropri-

ation by the debtor of the property so assigned to the purpose of paying his debts, and he retains no interest in or control over it, and has no right to have it applied for his own benefit in any manner whatever until the debts have been fully paid. 5 C. J. 1051, and numerous cases there cited.

"The sole purpose of the assignment must be to immediately appropriate the debtor's property to the payment of his debts. The reservation of any benefit or advantage to the debtor, before his debts shall be fully paid, will avoid the assignment." Bennett v. Ellison, 23 Minn. 242.

A provision in the deed of assignment authorizing the assignee to compromise with the creditors renders the assignment void. McConnell v. Sherwood, 84 N. Y. 522, 38 Am. Rep. 537; Hudson v. Maze, 4 Ill. 578; Keevil v. Donaldson, 20 Kan. 165; Gazzam v. Poyntz, 4 Ala. 374, 37 Am. Dec. 745. In Bennett v. Ellison, 23 Minn. 242, the deed of assignment contained no provision authorizing the assignee to compromise with creditors, but the jury found as a fact that the assignor made the assignment with the intention of compromising with them, and this court, speaking through Chief Justice Gilfillan, said:

"The intent to effect a compromise by means of the assignment includes the intent to delay the execution of the trust expressed in it, at least so long as might be necessary for the assignor to ascertain if the creditors would compromise. This was an intent to delay beyond the delay which might be necessarily incident to the execution of the trust to sell the property and pay the proceeds to the creditors, and was, therefore, fraudulent. The intent was also thereby to secure a benefit to the assignor, to-wit, a discharge from his debts without full payment, and without even the application of all his property upon those debts. For these reasons the assignment was, as between the assignor and his creditors, void."

An agreement between the assignor and assignee to purchase the claims of creditors at a discount for the benefit of either or both is in violation of the duty which both owe to the creditors and void, and it has been held that the courts will not aid either one to recover from the other gains made in such transactions, as doing so would give effect to the illegal contract. Haswell v. Blake (Tex. Civ. App.) 90

S. W. 1125; Commonwealth v. Scoville, 101 S. W. 1188, 31 Ky. Law, 257; McDonald v. Haughton, 70 N. C. 393; Burton v. Platter, 53 Fed. 901, 4 C. C. A. 95; Foote v. Emerson, 10 Vt. 338, 33 Am. Dec. 205; Tappan v. Albany Brewing Co. 80 Cal. 570, 22 Pac. 257, 5 L.R.A. 428, 13 Am. St. 174.

The assignment creates a trust for the benefit of the creditors. The creditors are the beneficiaries, the cestuis que trustent. The deed which creates the trust confers, defines and limits the powers and duties of the assignee, and gives the creditors as beneficiaries a vested interest in the property and its proceeds, which cannot be changed or impaired by the act of either assignor or assignee or by the joint act of both. Mackellar v. Pillsbury, 48 Minn. 396, 51 N. W. 222; In re Bird, 39 Minn. 520, 40 N. W. 827; In re Fuller, 42 Minn. 22, 43 N. W. 486; National Surety Co. v. Hurley, 130 Minn. 392, 153 N. W. 740, L.R.A. 1918F, 440; Chapin v. Thompson, 89 N. Y. 270; Monteith v. Hogg, 17 Ore. 270, 20 Pac. 327.

The assignee must execute the trust according to its terms. · He must convert the property into money and pay the lawful claims of the creditors to the full extent that the amount realized from the property will permit. His first duty is to the creditors and he is not allowed to do anything for the benefit of the assignor which will be detrimental to the interests of the creditors. They are entitled to payment in full, if the property be sufficient to pay in full, and any agreement, having a tendency to create a temptation for the assignee to make unfavorable representations to the creditors concerning the state of the assets for the purpose of influencing them to compromise or discount their claims, is contrary to public policy and unenforceable. McDonald v. Haughton, 70 N. C. 393; Matter of Coffin, 10 Daly, 27; Commonwealth v. Scoville, 101 S. W. 1188, 31 Ky. Law, 257.

The assignment was made December 23, 1913. At the annual meeting of the stockholders held January 15, 1914, the matter of making a compromise with the creditors was considered and the stockholders by motion:

"Recommended to the directors that a proposition of settlement be made to the creditors on a basis of ninety cents on the dollar, payable as follows: $50,000 cash on Feb. 1, 1914, and the balance on notes due

Nov. 15, 1914, without interest, provided this is the best terms obtainable."

Nothing was accomplished in the way of a compromise as the directors were without funds to make the initial payment.

At a meeting of the board of directors held on the morning of February 27, 1914, W. B. Windsor, a stockholder of the company, offered to furnish the money and buy up the claims against the company, or such of them as could be obtained at a satisfactory discount, if allowed forty per cent of the discount so obtained. The board concluded to accept his offer, whereupon Mr. Windsor stated that it would require more money than he could raise personally and requested them to hold the matter in abeyance and adjourn the meeting until evening to give him an opportunity to see if he could arrange for the necessary money. They did so. After the adjournment Windsor went to defendant Adams, and their negotiations resulted in an arrangement by which Adams, aided by Robert Hannah, agreed to provide the necessary funds, and by which the three were to share equally in the amount which Mr. Windsor would receive under his arrangement with the board of directors. At the adjourned meeting of the board in the evening, Mr. Windsor presented his proposition in writing in the following form:

"February 27, 1914.

"To the Board of Directors of the Fergus Falls Woolen Mills Co.,
  "Gentlemen:

"In accordance with the informal discussion which I had with you this morning in regard to making a settlement of the claims against the Fergus Falls Woolen Mills Company, I desire to make you this definite proposition:

"I will advance the necessary funds to purchase all the adjusted claims against the Woolen Mills Company, where they can be purchased at a sufficient discount to be of interest for the company, provided that the company will pay forty per cent of the amount saved for the company, and six per cent interest after the first day of April, 1914, on the funds which I have advanced.

"In case your board desires to accept this proposition I wish to have

them pass a resolution authorizing me, as their representative, to make this settlement.

"Respectfully yours,
"W. B. Windsor."

The board of directors adopted a resolution in which, after reciting that for want of funds they had been unable to carry into effect the recommendation made by the stockholders at the annual meeting, or to make any proposition of settlement to the creditors, and that they had submitted Mr. Windsor's proposition to the holders of a majority of the stock of the company and that these stockholders had unanimously recommended its acceptance, they resolved:

"That the proposition of W. B. Windsor made in writing under date of February 27, 1914, wherein and whereby said W. B. Windsor agrees to advance all necessary funds to purchase such adjusted claims of the Fergus Falls Woolen Mills Company as can be purchased at a sufficient discount to be of interest for the company, and for furnishing the necessary funds and financing the purchasing of such claims and for all services and expenses in connection therewith the said W. B. Windsor is to receive forty per cent of the actual amount saved for the company in purchasing such claims, and the said W. B. Windsor to be entitled to interest on the amounts actually paid for any and all claims from and after April 1, 1914, at the rate of six per cent per annum, and said forty per cent of amount saved to be in full for advancing all necessary funds and in full compensation for all expenses and services in connection with said proposition, be and is hereby accepted, and

"Resolved further that in order to carry out said proposition the said W. B. Windsor be and is hereby appointed representative of the Fergus Falls Woolen Mills Company for that purpose and authorized to account in that behalf."

Under this agreement Mr. Windsor purchased claims against the company amounting to the sum of $96,358.48 for which he paid the sum of $83,612.62. Mr. Adams procured the money to make these purchases and borrowed the most of it from banks in St. Paul and Minneapolis, with which he had business connections. By direction of the directors Mr. Windsor was paid the amount which he had expended and

40 per cent of the discounts which he had obtained, the company taking the benefit of the remaining 60 per cent of such discounts. Out of his share of the discount Mr. Windsor paid Mr. Adams the sum of $1,672.76 for his services in procuring the money used in buying the claims, and in becoming personally responsible for its repayment to those from whom it had been borrowed. No claim is made that any of the trust funds were used in these transactions. On the contrary, as already stated, the principal complaint of plaintiff is that the trustees refused to make compromises with the creditors or to use the trust funds for that purpose. They could not lawfully have done so. They had sufficient funds to pay a substantial dividend within a few weeks after the assignment, and some complaint is made because they failed to reduce the indebtedness by doing so. Although the assignment was valid between the parties to it, the deed of assignment contained provisions which made it void under Lucy v. Freeman, 93 Minn. 274, 101 N. W. 167, and Moore v. Bettingen, 116 Minn. 142, 133 N. W. 561, Ann. Cas. 1913A, 816, as to any nonassenting creditor who might see fit to attack it, either in proceedings to enforce his individual claim, or in proceedings under the bankruptcy law. By the terms of the deed only those creditors who became parties to it were entitled to share in the distribution made under it, and some of the creditors, while not dissenting, withheld their assent to it until the trust was ready to be closed in June, 1914. The trustees satisfied and discharged all the debts within six months after assuming their trust, and, in view of the situation which existed, we think they cannot be justly criticised for failing to pay a dividend earlier.

It will be observed that the money paid by Windsor to defendant Adams did not come from either the trust funds or the trust property, but from the compensation paid Windsor by the company under and pursuant to the written contract. This contract was made by the company for its own benefit, and there is no claim that the company did not receive the full benefit to which is was entitled under the contract. The company knew, before it closed the contract, that Windsor had arranged to procure from others the funds necessary to enable him to perform it, but did not know by whom or on what terms such funds were to be furnished, and did not concern itself about those matters. From whom

Windsor procured his funds and what he did with his own compensation in no way affected the rights of the company. Adams owed no duty to the company to assist in buying up claims or in providing money for that purpose, and we fail to see wherein he violated any duty to the company in procuring the money for Windsor in consideration of a share in the amount to which Windsor would be entitled under his contract. If the creditors, who sold their claims to Windsor at a discount, were here complaining, a different question might be presented. But the creditors are not parties to this action, are making no complaint, and their rights are not involved.

Robert Hannah, a broker of Fergus Falls, purchased claims against the company of the face value of $7,406.32 before the company made its contract with W. B. Windsor. Hannah made these purchases on his own account, and insisted upon and collected the full amount of the claims. The evidence concerning the connection of defendant Adams with these transactions is meagre, and consists only of the statement of Adams that he furnished Hannah the money used in buying the claims, and that after the claims had been paid he received the sum of $804 from Hannah as his share of the profit for having furnished the money to buy them, and that the creditors had no knowledge of these facts. There is nothing further to show the arrangement between him and Hannah, or how or when it was made. It is clear that the transaction involved no use of trust funds and no purchase of trust property.

The company had made no composition agreement with its creditors, and could not require them to discount their claims as a condition of receiving payment. An agreement with individual creditors to accept less than the amount due would have been void for lack of consideration. 1 Dunnell, Minn. Dig. §§ 1506, 1507. The trust property was sufficient to pay all claims in full, and both the company and the trustees owed the creditors the duty to pay them in full. Of course the creditors could sell and transfer their claims for whatever price they saw fit. But they were the beneficiaries of the trust, and if the trustees, without their full knowledge and consent, were interested in the purchase of their claims and derived a profit therefrom other than proper interest on money advanced, they could require the trustees to account to them for all such profits. Conceding that Adams received profits forbidden

by the law, the duty which he violated was his duty to the creditors. The company paid no more than it ought to have paid, but the creditors who sold their claims received less than the company owed them. If Adams has received any illegitimate profits growing out of the purchase of these claims, such profits belong to the creditors, not to the company, and the creditors have the right to call him to account and recover them. But the creditors are not parties to this action, and their rights cannot be determined herein. Whether the company could recover such profits if they had made the creditors who sold their claims at a discount parties to the action and had shown that these creditors, or any of them, were estopped from recovering from Adams, is a question not involved and not determined herein.

Defendants Anderson and Jordan had no part in the transactions of defendant Adams hereinbefore set forth and the court finds, on ample evidence, that they had no knowledge of his dealings with Robert Hannah and W. B. Windsor. Consequently there is no theory on which they could be charged with liability therefor on this record. But of course these findings are binding only on those who are parties to the action and not on the creditors.

At the time of closing the trust, the trustees presented the question of their fees to the board of directors. Adams and Anderson asked for the sum of $1,750 each and Jordan asked for the sum of $1,500. The directors approved and allowed these claims and they were subsequently paid out of the funds in the hands of trustees. The trial court found that these amounts were just and reasonable, and that the trustees were fairly and honestly entitled to them, and we find no reason for disagreeing with the conclusion of that court.

The order appealed from is affirmed.