MINNEAPOLIS TRUST COMPANY v. LOUIS F. MENAGE and Others.

July 22, 1898.

Nos. 11,194—(254).

**Trust—Sale of Bonds—Trustee's Account.**

One Menage had delivered to the Guaranty Loan Company a large amount of the second mortgage bonds of the West Pullman Association, in trust to secure the payment of a large number of promissory notes which he had negotiated to a large number of persons, and on which he

was liable as guarantor. The Guaranty Loan Company having become insolvent, the court appointed the Minneapolis Trust Company trustee in its place, to dispose of the bonds to the best advantage, and distribute the proceeds among the holders of the notes. The Trust Company petitioned the court for authority to sell the bonds for ten cents on the dollar to a syndicate which had offered that price. Notice of the application was given to the holders of the notes, by mailing to each of them, nine days before the hearing, a copy of the petition and of the order of court fixing the time and place of hearing. On the day of hearing, no one opposing, the court granted the petition, and the trustee sold the bonds for the price offered. When the trustee filed its report for approval and allowance, one of the note holders, on behalf of himself and all others, filed objections to the allowance of the account, charging that the trustee in making the sale was guilty of fraud and positive bad faith, and sacrificed the bonds for a nominal consideration, when they were worth nearly par. The court found that the trustee had acted in good faith, and approved and allowed its account, in which it was charged merely with the amount it had actually received for the bonds. *Held*:

### Beneficiary May Surcharge Account if He Can Show Fraud.

1. That, notwithstanding that the note holders had not appeared and opposed the granting of the order authorizing the sale of the bonds, they had a right to surcharge the account of the trustee if they could show that it was guilty of fraud and bad faith in making the sale.

### Findings Supported by Evidence—Trustees—Public Policy.

2. That, while the rule applicable to ordinary civil actions—that an appellate court will not disturb the findings of the trial court if there is evidence reasonably tending to support them—applies to this case, yet, as the highest degree of good faith is required of a trustee, the evidence should be very closely scrutinized. Public policy demands that a court should require of trustees, especially those of its own appointment, the utmost good faith in the execution of their trusts, and exact of them clear and satisfactory explanations of any acts on their part reasonably tending to cast suspicion upon their fidelity to their trusts; and, the more numerous the suspicious circumstances are, the more clear and satisfactory ought the explanations to be.

### Respondeat Superior Applies to Agents of Trustees.

While there may be no evidence that the directors of the Trust Company were guilty of any personal fraud or bad faith, the doctrine of respondeat superior applies, and the Trust Company would be liable for any fraud or bad faith on the part of its agent to whom the directors had intrusted the business.

Evidence.

> Evidence considered, and *held*, that the account and explanation of the trustee of its official conduct is not sufficiently satisfactory to justify the court, without further investigation, in placing the seal of its approval upon the conduct of its trustee.

The Minneapolis Trust Company, as trustee, filed in the district court for Hennepin county its report of receipts and disbursements in connection with the sale of certain collateral held by it in trust. The La Salle National Bank, a creditor interested in the collateral, filed its exceptions to the report, which were adopted by certain other creditors. The exceptions were heard before Russell, J., who on July 6, 1897, overruled them, approved the account of the trustee and ordered judgment in its favor.

In September, 1897, John M. Norris, as receiver of the defendant Menage, petitioned that he be substituted for Menage and become a party to the action with the same rights as if Menage had become a party thereto, and that he be permitted to adopt the exceptions of said bank to the trustee's report. This petition was granted upon terms. In February, 1898, La Salle National Bank and said Norris, as such receiver, moved that the order of July 6, 1897, be vacated and for a new trial. This motion came on to be heard before Smith, Elliott, McGee and Lancaster, JJ., and on March 15, 1898, the motion was denied in an order signed by all of these judges except McGee, J. At the foot of the order it was stated that McGee, J., concurred in the making of it.

On March 16, 1898, the following memorandum was attached to the foregoing order:

"This order does not touch the merits of the case which was decided by Judge Russell. I have signed it because I think the wrong procedure has been adopted. When properly presented the entire matter should be fully investigated de novo.

"Elliott, J."

Thereafter an additional memorandum was filed. This second memorandum referred to the foregoing memorandum of Judge Elliott. Among other matter it contained the following paragraphs:

"The memorandum so filed [Judge Elliott's memorandum] has been taken by the attorneys in the case as expressing the unanimous opinion of all the judges who heard the motion. Under those circumstances we deem it proper to make known by filing this memorandum that we do not concur in the opinion of Judge Elliott so filed."

"As to the question of procedure, we were and are of the opinion that the procedure was proper and correct after the amendment to the motion was allowed, making it a motion to set aside Judge Russell's order.

"Dated this 6th day of April, 1898.

"Seagrave Smith,
"J. F. McGee,
"Wm. A. Lancaster,
"Judges."

From these orders of July 6, 1897, and of March 15, 1898, the La Salle National Bank and said receiver appealed. Reversed.

*Francis B. Hart, Charles J. Bartleson* and *A. B. Jackson*, for appellants.

For parallel cases applying the principles of equity in relation to trustees' duties, see Bound v. South Carolina Ry. Co., 50 Fed. 853; Snyder v. McComb, 39 Fed. 292; Davoue v. Fanning, 2 Johns. Ch. 252; King v. Remington, 36 Minn. 15.

*W. E. Dodge* and *Charles S. Albert*, for respondent.

Where there is evidence tending to establish the facts found by the court, although the evidence preponderates in favor of appellant, the order denying the motion for a new trial must be affirmed. The finding, in order to be disturbed, must be overwhelmingly against the weight of the evidence. Foot v. Mississippi & R. R. Boom Co., 70 Minn. 57; Moran v. Small, 68 Minn. 101; Weibeler v. Ford, 61 M. 398; Childs v. Nordella, 116 Mich. 511.

A new trial will not be granted upon the ground that the evidence is not sufficient to sustain the verdict or decision, unless upon a careful perusal of the same, and upon mature reflection, the appellate court feels satisfied that the preponderance of the evidence is manifestly and palpably against the verdict or decision. Hicks v. Stone, 13 Minn. 398 (434); Hughley v. City of Wabasha, 69 Minn.

245; Reynolds v. Reynolds, 44 Minn. 132; Koktan v. Knight, 44 Minn. 304.

Where a creditor appears at a hearing upon an application made by a receiver to sell property, does not object to the order of sale and allows the sale to take place in accordance with its provisions when he might have previously objected, he will not be allowed to complain of a result, however prejudicial, caused by his own laches. Hospes v. Northwestern M. & C. Co., 41 Minn. 256; Spencer v. Wolfe, 49 Neb. 8.

A trustee is only prohibited from dealing with the trust property for his own benefit so long as the trust continues. When his duty toward the property ceases, he occupies the same relation to it as does a stranger to the trust, and, acting throughout in good faith, may become the owner of the property by purchase or otherwise. In re Shotwell, 49 Minn. 170, 180; Munn v. Burges, 70 Ill. 604; Bush v. Sherman, 80 Ill. 160; Foxworth v. White, 72 Ala. 224; Wortman v. Skinner, 12 N. J. Eq. 358; Boehlert v. McBride, 48 Mo. 505; 1 Perry, Trusts, § 133.

MITCHELL, J.

One Menage had discounted promissory notes, whose payment he had guarantied, of the face value of over one million dollars. About $100,000 of these notes were held by the Northwestern Guaranty Loan Company, but the balance was disposed of to about 150 different parties, principally banks, scattered over 10 or 12 different states. As security for the payment of these notes, he deposited in trust with the Guaranty Loan Company certain securities, including $295,000 second mortgage bonds of the West Pullman Association of Chicago. In May, 1893, the Guaranty Loan Company was adjudged insolvent, and the Minneapolis Trust Company (hereinafter called the "Trust Company") was appointed its receiver. In taking possession of the assets of the insolvent, the receiver came into custody of these West Pullman mortgage bonds. Just before its failure, the Guaranty Loan Company had attempted, but not consummated, a distribution of these bonds among several holders of the notes for whose payment they had been pledged.

The Trust Company, as receiver, commenced an action (to which

all the holders of the notes were made parties defendant) to set aside this attempted distribution, and to have the interests of the note holders in the mortgage bonds adjudged to be as tenants in common of the whole, and not several or separate in a particular part of them.   December 12, 1894, the court rendered judgment in accordance with the claim and prayer of the Trust Company, and appointed it trustee in place of the insolvent Guaranty Loan Company, to execute the trust by disposing of the collaterals to the best possible advantage under such orders as might thereafter be made by the court, and distribute the proceeds pro rata among the holders of the notes.

On February 21, 1895, the Trust Company presented to the court a petition for an order authorizing it to sell the bonds to one King, of Boston, and his associates, known as the "Coombes Syndicate," for 10 cents on the dollar of their face value, without interest, in accordance with the terms of their offer, which was attached to the petition.   On the same day, the court fixed March 4 as the time for hearing the petition, and ordered that notice of the hearing be given to all the holders of the notes, by mailing to them a copy of the petition and of the order on or before February 26, and by publishing the same in the Minneapolis Tribune on the 23d, 26th, and 28th days of February, which was done.   When the matter came up for hearing, on March 4, no one appeared to object, and the court made an order authorizing the Trust Company to accept the offer of King and his associates of 10 cents on the dollar for the bonds.   The Trust Company, in pursuance of this order, sold the bonds.

In January, 1896, the Trust Company presented to the court a report of its receipts and disbursements in connection with the execution of the trust, and asked for its approval and allowance. In this report the Trust Company charged itself with 10 cents on the dollar as the amount received for the bonds.   Upon the hearing, the La Salle National Bank appeared, and, in behalf of itself and all other note holders, filed objections to the allowance of the account of the Trust Company, the substance of which was that, in making this sale of the West Pullman bonds, the Trust Company was guilty of fraud and positive bad faith in sacrificing them for a

nominal consideration, when they were worth, as it knew, their face, or nearly that amount. The court, after hearing the evidence, found that the Trust Company had properly executed its trust in entire good faith, and allowed its account as presented. The La Salle National Bank then moved for a new trial on the ground that the evidence did not justify the finding; also on the ground of newly-discovered evidence. The court denied the motion, and thereupon the bank appealed.

1. The point is made by the respondent that, inasmuch as the appellant made no objections to the order of court authorizing the sale on the exact terms on which it was made, and as that order is in no manner assailed, the appellant cannot now object to the act of the trustee in selling in accordance with the order of court. The trust in these collaterals was not created by the court, but by the convention of the parties. The trusteeship of the Trust Company as to these collaterals was entirely separate and distinct from its receivership of the assets of the Guaranty Loan Company. The situation in that respect was not altered by the fact that the estate of the Guaranty Loan Company, as owner of $100,000 of the notes, was one of the beneficiaries of the trust. The Trust Company was merely substituted as trustee in place of the Guaranty Loan Company. It may therefore admit of discussion as to the effect of the order of the court authorizing the sale of the bonds.

But conceding for this order all the effect of one made in an action in which the court had jurisdiction of the subject-matter and of the parties, and conceding also, without deciding, that, under objections to the report of the trustee, the appellant could not be heard to assert mere want of reasonable skill or business judgment on the part of the trustee in selling the bonds for the price obtained, yet it is still open to it to urge that the trustee was guilty of fraud or positive bad faith in petitioning for and procuring this order; as, for example, by misrepresenting the facts to the court, or by concealing from it any material facts which might or would have affected its action. If that can be shown, we have no doubt that appellant could insist that the account should be surcharged, and the trustee charged with the actual value of the property fraudulently sacrificed; that is, with the amount which,

under all the circumstances, could have been obtained for it by honest management.

2. Counsel for the respondent also invokes the familiar rule that, if there is evidence reasonably tending to support the findings of the trial court, an appellate court will not disturb them. Rightly understood and correctly applied, this rule has its place in proceedings like the present, as well as in ordinary civil actions. But it must be remembered that this is not an ordinary action, involving no consideration of public policy but merely a disputed issue of fact, affecting only the private property rights of the parties. The highest degree of good faith is required of a trustee in the execution of his trust. Public policy demands that this duty be faithfully performed and rigidly enforced. The courts ought, in the interests of the administration of justice, to see to it that the standard of duty in such matters is not lowered, even if the parties themselves are disposed to overlook or condone a departure from the strict line of duty. They are especially interested in seeing that trustees of their own appointment perform the full measure of their duty. The fact that receiverships and other positions of trust are nowadays too often used for the personal benefit of the receiver or trustee himself, or to promote some scheme of third parties, rather than for the benefit of the cestuis que trustent, is all the greater reason why courts should exact of such trustees the utmost good faith and fidelity to their trust, and require them satisfactorily to explain any acts on their part tending to cast serious doubt upon the integrity of their official conduct.

3. The evidence introduced on the hearing was quite voluminous, and the facts more or less complicated. It would therefore be impossible fully to discuss and analyze the testimony within any reasonable limits; and, as we have concluded that a new trial or rehearing must be had, it would perhaps be unfair to the respondent to do so at this time. We shall therefore content ourselves with merely giving a sufficient outline of the situation to indicate the reasons why we think that there ought to be further investigation of this transaction before this account should be allowed, and the conduct of the trustee receive the official approval of the court.

In the first place, it appears that, in all matters pertaining to

the management and disposition of these West Pullman bonds, one Hamblin, its assistant secretary, was the Trust Company. Substantially the whole matter was from first to last left to him. The doctrine of respondeat superior fully applies, and whatever he did or omitted to do in the premises must be deemed to have been done or omitted by the Trust Company. In the next place, while the Trust Company was not appointed trustee until December, 1894, yet, being interested in the bonds as receiver, it began its investigation as to their value, the nature and value of the property mortgaged to secure their payment, and the financial condition of the West Pullman Association, soon after its appointment as receiver of the Guaranty Loan Company, in May, 1893; and practically every fact affecting the value of these bonds known to it when it petitioned the court, in February, 1895, for authority to sell for 10 cents on the dollar, was known to it prior to its appointment as trustee, in December, 1894. The condition of the West Pullman company, and of its property, was about as follows:

Liabilities.

| | |
|---|---:|
| First mortgage bonds.............................$ | 150,000 |
| Second mortgage bonds........................... | 340,000 |
| Special assessments on real estate.................. | 150,000 |
| Floating debt.................................. | 150,000 |
| Total .......................................$ | 790,000 |

Assets.

| | |
|---|---:|
| Bills receivable, pledged as collateral to secure payment of floating debt...........................$ | 300,000 |
| Real estate (lots unsold), estimated value............ | 1,500,000 |
| Total ......................................| $1,800,000 |

The liens of the first mortgage and of the special assessments were prior to that of the second mortgage; but there was property (not including land donated to manufacturing concerns) estimated to be worth more than the amount for which the bonds were sold, which was included in the second mortgage, but not covered by the first mortgage. While the real estate was suburban, and its value more or less speculative, yet the fact is practically undisputed that its intrinsic value was more than the amount of both mortgages, and ample to pay both, unless sacrificed on the first

73 M.—29

mortgage. While the West Pullman Association itself was without ready money or the means of raising it, yet among its members there were, to the knowledge of the Trust Company, men of liberal means, who were certainly quite as much interested in protecting their property from sacrifice as were the holders of the second mortgage bonds in protecting their securities.

During the year 1894, and as late as November of that year, some of these men interviewed Hamblin with reference to purchasing these bonds at a discount, and intimated their readiness to pay for them, if necessary, 50 to 60 cents on the dollar; but he declined to entertain any such proposition, or to submit it to the directors of the Trust Company, and expressed the opinion that the bonds were worth par. He knew at this time that the first mortgage, or a part of it, was overdue, and that the time of payment had only been extended until February 1, 1895. Hamblin devised schemes for a new issue of bonds by the West Pullman Association of sufficient amount to take up all its indebtedness, including the first mortgage. This involved the purchase for cash, by the holders of the second mortgage bonds, of enough of the new issue to raise money to pay off prior incumbrances, particularly the first mortgage. As the Trust Company held the entire issue of second mortgage bonds, except some $45,000 held by three banks, this scheme would require it to invest a large amount of money in the new issue, which the court would not be inclined to sanction.

For this and other reasons, the scheme was not successful, although the evidence tends to show that Hamblin in good faith continued his efforts to relieve the situation up to the time he went East, in the latter part of January or first part of February, and had interviews with some of those belonging to what is known as the "Coombes Syndicate," consisting of King and his associates. This was in no sense an association either of creditors of the Guaranty Loan Company or of creditors or shareholders of the West Pullman Association, although it may have contained some of both. It was essentially a syndicate to make profit for itself, by carrying through a scheme to float a new issue of bonds by the West Pullman Association, sufficient in amount to cover all its indebtedness. A part of this scheme, and the one from which a large part of the

prospective profits to the syndicate was to accrue, was to buy up the second mortgage bonds at as low a price as possible. One of the syndicate had already secured an option to buy the first mortgage, and had gotten an extension of the time for its payment until April 1.

The evidence tends to show that, from this time on, Hamblin was desirous that the scheme of the Coombes Syndicate to buy the second mortgage bonds held by the Trust Company, for 10 cents on the dollar, should succeed, and gave it all the aid he could. The petition to the court was very brief, and referred mainly for a statement of the facts to the proposition of King and his associates, which was attached to the petition. Notwithstanding that this proposition involved a sale of the bonds for one-tenth of their face, so entirely inconsistent with the previous views entertained and expressed by Hamblin, and notwithstanding that the notice to the numerous note holders, scattered all over the country, was so brief and utterly inadequate to enable them to confer with each other, and devise a scheme to protect their interests from sacrifice, the petition was filed, the order of sale obtained, and the sale made, without any communication on part of the Trust Company with the note holders, or any notice to them, save mailing to them a copy of the petition and of the order of the court, and apparently without any previous effort to ascertain whether the Chicago parties who had indicated in November a willingness to give 50 or 60 cents on the dollar were still disposed to make an offer for the bonds. The petition to the court, of which the proposition of the syndicate was made a part, was in some respects misleading and an incomplete statement of the facts. It stated that, if the first mortgage was foreclosed, the purchaser would be entitled to immediate possession of the property; but it was silent as to the fact that, under the laws of Illinois, there was one year within which a redemption might be made. It stated, by implication at least, that the amount of special assessments against the property was $200,000, when in fact the amount remaining due was only $150,000. It was silent as to the fact that there was some property not covered by the first mortgage upon which the second mortgage was a first lien.

The evidence tends to show that there was due the Trust Com-

pany, as receiver of the Guaranty Loan Company, some $35,000 or $40,000 for fees and disbursements, and that no cash had been realized out of the Guaranty Loan assets with which to pay this claim; that the Trust Company was anxious to sell the equity of redemption in the Guaranty Loan Building for $75,000 cash, which had been offered, but that Coombes and those whom he represented had opposed the sale; that, after the proposed sale of the West Pullman bonds to the syndicate for 10 cents on the dollar had been favorably entertained by Hamblin, Coombes withdrew his opposition to the sale of the building; that the sale was consummated in March, which brought $75,000 cash into the hands of the Trust Company, as receiver, which paid its claim, and left about $30,000 in the treasury.

When the sale of the West Pullman bonds was consummated, the interest of the Trust Company in them as receiver, amounting to $30,000, was not sold for 10 cents on the dollar, but it received for them bonds of the new issue dollar for dollar, and that, too, without its having to subscribe and pay for in cash any additional bonds of the new issue.

It will be seen upon examination of the proposition of the Coombes Syndicate that it provided for the holders of the notes (for the payment of which the West Pullman second mortgage bonds had been pledged), and also the general creditors of the Guaranty Loan Company participating in the purchase to a certain amount, upon certain specified terms. If the scheme proved a profitable one, as its promoters anticipated, the more persons that came in to participate in the purchase, the less would be the profits to the syndicate. The evidence shows that the syndicate was anxious that as few as possible of the creditors should come in and participate in the purchase, and that Hamblin shared in this feeling. He was keeping the syndicate advised from time to time as to the amount of subscriptions by creditors, and, in response to these reports, one of them writes him, "Am glad so small an amount is subscribed," and another, "Thanks; hope they will not come in more rapidly."

It further appears that, under the terms of the West Pullman mortgages, the purchasers of lots were entitled to releases and a

clear title upon paying certain amounts of the bonds at par. During February and March, 1895, some of the purchasers of lots were ready and anxious to pay up and obtain releases. The correspondence between Hamblin and the vice president of the West Pullman Association (who appears to have been co-operating with the Coombes Syndicate) shows that both of them were co-operating to induce such purchasers to defer paying and wait for their releases until after the whole deal or scheme was consummated; thus insuring payment of such bonds to the syndicate instead of the trustee. For example, on February 21, he writes to Kneeland:

"The parties interested in the rebonding scheme would not desire the bonds to be taken at this time if it can be avoided. * * * The best I can do is to write the enclosed letter bearing upon the subject, and perhaps by showing the said letter to the kickers [those who want to pay and get releases] as they come around, that with your estimation of the general situation they will be willing to wait until the rebonding scheme is finally completed. Everything seems to look favorable now for the scheme."

In this "enclosed letter" which he sent to Kneeland, to show to "kickers," he urges various reasons why they should be willing "to wait until April 1st before requesting us to accept payment of any of the second mortgage bonds which we hold."

The evidence further tends to show that the Coombes Syndicate realized a large profit out of the deal. After the whole thing was consummated, Hamblin was elected a director of the West Pullman Association, and obtained from King 11,600 of the new issue of bonds for about 40 cents on the dollar, which was what they cost the syndicate. There is, so far as we can discover, no evidence that any of the directors or general officers of the Trust Company were guilty of any personal fraud or bad faith; but, as already suggested, if Hamblin was, they are legally responsible for his acts.

It is not for us to decide whether, in recommending and urging the sale of these bonds for so small a price, Hamblin did it in good faith, honestly believing it to be for the best interests of the note holders, or whether the withdrawal of the opposition to the sale of the Guaranty Loan Building was his controlling motive, or whether his conduct was induced by some understanding that, if the syndi-

cate's scheme went through, he was to have some share of the profits. But there are certainly quite a number of circumstances which are calculated to cast much doubt upon his entire good faith towards his cestuis que trustent, and which call for satisfactory explanation. Such explanation has been attempted; and, if there were but one or two of these suspicious circumstances, the explanations might be satisfactory.

But there is a point beyond which explanation ceases to explain. The more numerous the circumstances requiring explanation, the clearer and more satisfactory the explanations should be. Taken as a whole, we do not think that the evidence is such that a court ought, without further investigation, to set its seal of approval upon the official conduct of a trustee of its own appointment.

The "newly-discovered evidence" set up in appellant's affidavit would not of itself constitute a ground for a new trial. Much of this affidavit is the mere inference or conclusion of the affiant. Much of the so-called "newly-discovered evidence" is not new, but was introduced on the hearing already had. But there are a few new facts alleged to have been brought out in the evidence in the "libel case" of the state against the Minneapolis Times, which would tend to somewhat strengthen appellant's case.

We are therefore of opinion that, under all the circumstances, a new trial or rehearing should be granted, so that the conduct of the trustee in this matter may be more thoroughly investigated, and that the appellant may have an opportunity to introduce whatever additional evidence it may have discovered. It is so ordered.