# W. B. FOSHAY COMPANY v. MERCANTILE TRUST COMPANY AND OTHERS.[1]

July 6, 1928.

Nos. 26,423, 26,424, 26,425.

**Action in tort.**

In this action charging one respondent with conspiracy, fraud, duress, abuse of process, breach of trust, breach of contract and tortious acts resulting in damages to plaintiff and the bankruptcy of the appellant the defendant foundry company, and damages to its creditor, the appellant defendant bank, and to the stockholders of the foundry company, it is *held*:

**When new trial will not be permitted.**

1. No ruling upon the exclusion or admission of evidence warrants a new trial.

**Findings unnecessary except upon ultimate issuable facts.**

2. The court made findings upon every ultimate issue of fact necessary to sustain the judgment ordered. Having so done it was not required to find upon issues of fact which could not affect that judgment, such as insolvency of the foundry company when adjudged a bankrupt, or the value of property and business acquired by the range company from the trustee in bankruptcy.

**No fiduciary relations arose from tentative agreements other than exhibit D.**

3. The findings are sustained by the evidence that tentative plans and proposed written agreements looking to extending forbearance and financial aid to the foundry company, other than by and through exhibit D (by a creditors' advisory committee), never were consummated or executed, and no fiduciary relations arose therefrom.

**Defendant trust company was not a party to a joint adventure.**

4. The evidence does not warrant a finding of any joint adventure to which the trust company was a party.

**Defendant trust company did not contract to loan money to foundry company.**

5. A finding is not justified that the trust company had entered into a contract to lend the foundry company $50,000, or any other sum.

[1]Reported in 220 N. W. 551.

No fiduciary relation arose from sale of "gold notes."

6. The arrangement under which the trust company had sold the "gold notes" of the foundry company did not create fiduciary relations as to any subsequent transactions or negotiations between the parties.

By its very terms exhibit D failed to become effective and caused release of trust company.

7. In so far as anything was done pursuant to exhibit D, the doctrine of fiduciary relations applies; but it never became fully effective for lack of signatures, and by its own terms as well as by the acts of appellants released the trust company from such relations prior to its joining with other creditors in the involuntary bankruptcy petition.

Adjudication of bankruptcy court conclusive.

8. The adjudication of the bankruptcy court should be conclusive as to insolvency—there being no fraud, duress, abuse of process or violation of duty or contract on the part of the trust company—and also conclusive of the right of the trust company to join in the bankruptcy petition in so far as its connection with exhibit D was concerned, since that was disclosed on the face of the petition.

Range company does not hold property as trustee ex maleficio.

9. The evidence does not warrant findings or conclusions that the range company holds title to the property purchased from the trustee in bankruptcy as a trustee ex maleficio.

Appeal and Error, 4 C. J. p. 917 n. 39.
Bankruptcy, 7 C. J. p. 88 n. 5.
Contracts, 13 C. J. p. 776 n. 96.
Joint Adventures, 33 C. J. p. 871 n. 21.
Trial, 38 Cyc. p. 1966 n. 89.
Trusts, 39 Cyc. p. 185 n. 70; p. 193 n. 8.

Plaintiff, the defendants Bankers National Bank and Minnesota Stove Company, and the defendants George L. Nye, Charles W. Nye and Tillie C. Potter individually and as directors and representatives of the stockholders of the American Range & Foundry Company, appealed from an order of the district court for Hennepin county, Waite, J. denying their respective motions for a new trial. Affirmed.

*H. E. Fryberger, Donald E. Bridgman* and *Leslie H. Morse,* for plaintiff-appellant.

*H. V. Mercer* and *E. J. Lien,* for appellants Minnesota Stove Company, George L. and Charles W. Nye, and Tillie C. Potter.

*Junell, Dorsey, Oakley & Driscoll,* for appellant Bankers National Bank.

*Samuel A. Mitchell* and *Todd, Fosnes & Green,* for respondent Mercantile Trust Company.

*Joseph J. Moriarty, Grimes & Maxwell* and *William F. Odell,* for respondent American Range Corporation.

HOLT, J.

Appeal by plaintiff and by defendants Bankers National Bank, Minnesota Stove Company, George L. Nye, Charles W. Nye and Tillie C. Potter individually and as directors and as representatives of the stockholders of American Range & Foundry Company from the orders denying their several motions for a new trial.

The pleadings with attached exhibits cover over 240 pages of the 5,200 pages of the printed record. The summary of appellants' pleaded causes of action, as stated when the case was here on application for a writ of mandamus to change the place of trial to Hennepin county, should suffice. W. B. Foshay Co. v. Mercantile Trust Co. 166 Minn. 442, 208 N. W. 203. It may be conceded that appellants' several and separate pleadings cover all possible allegations of conspiracy, fraud, joint adventure, fiduciary relations, breaches of trust and violations of agreements so as to warrant any relief which the evidence would justify.

We shall attempt a short summary of the events upon which the litigation is predicated and which are either undisputed or too well established to be questioned.

[Facts]

In Shakopee, Minnesota, there was established by George L. Nye, as early as 1891, a stove factory, sometime later taken over by the appellant corporation the Minnesota Stove Company. In 1919 a Delaware corporation, the appellant American Range & Foundry

Company, succeeded to all the rights of the Minnesota Stove Company, so that no further reference need be made to the latter, for any right of relief or recovery is now in its successor, the American Range & Foundry Company, hereinafter referred to as the foundry company. The individual defendants, as we view the situation, have no cause for redress except such as may come to them from the relief or recovery, if any, which may result to the foundry company. The Bankers National Bank will herein be referred to as the bank, and the defendant Mercantile Trust Company, a Missouri bank, as the trust company.

When the foundry company took over the business in 1919, a branch factory was established in East St. Louis, and it became a patron of the trust company. The establishment of the branch required additional capital; and in 1921 an arrangement was made with plaintiff to sell its special preferred stock, and from that time on until 1924 plaintiff sold over $200,000 par worth of such stock. In so doing it represented to the purchasers that it would protect them. Plaintiff, after the foundry company was adjudged bankrupt on October 27, 1924, redeemed its promise and has repurchased this stock at a cost of over $238,000. In 1923 the foundry company required more money. It had started out to establish retail stores in East St. Louis, Chicago and Los Angeles. The trust company underwrote and sold an issue of $250,000 of the foundry company's "gold notes" to raise the needed capital. Besides the indebtedness thus created, the foundry company in April, 1924, was indebted to the trust company in the sum of over $80,000, making a total liability to the trust company of over $300,000. At that time the foundry company also owed two banks in East St. Louis some $20,000 each, a New York bank about $45,000, and the appellant bank $40,000 and about $200,000 on merchandise. Some of these debts to the banks were secured by bills receivable. While the foundry company had unfilled orders in the amount of $400,000 and perhaps had on hand raw materials enough in the main to proceed with the filling of the orders, there were no funds available for meeting the monthly payroll, taxes, maturing loans, interest on the "gold notes," or the dividends of the special preferred stock sold. The foundry company as well as its main creditors deemed the situation critical.

In the first days of May, 1924, conferences were had between them which culminated in the drafting of three agreements on May 12, 1924, one to be executed by the trust company, the New York and the two East St. Louis banks. The chief parts of this agreement were that the banks were to furnish temporary loans to the amount of $75,000 to the foundry company—each bank in the proportion to the amount of its then claim, payment of which and the existing debt to be deferred until January, 1925. The appellant bank was not to be a party to this agreement, because it had already loaned the foundry company the limit permitted by law. Another agreement was for the foundry company to deposit a majority of stock with the officers of the trust company to form a voting trust, and the third agreement was between the foundry company and plaintiff, whereby plaintiff was to sell $100,000 of additional special preferred stock of the foundry company. These several agreements were not executed and failed of being put into operation. The New York bank refused additional help. It also developed that it was doubtful whether under the foundry company's articles of incorporation a sale of additional special preferred stock was authorized.

A conference with creditors was thereupon had on May 26, 1924, at St. Louis, at which plaintiff and the foundry company were represented, to devise some plan to keep the company going. Plaintiff's representative, Mr. Foshay, left somewhat disgruntled because his company was not recognized as a creditor on account of its obligation to those to whom it had sold the special preferred stock, he being told that out of any contemplated financial aid to be given the company no part should go to pay dividends on such stock. At this meeting it was agreed—Mr. C. W. Nye, the representative and general manager of the foundry company, reluctantly consenting— to appoint a creditors' advisory committee to take charge of and supervise the business in connection with the officers of the company. An agreement to accomplish this purpose, exhibit D, was drawn and executed by the foundry company as party of the first part, the committee selected as party of the second part, and the creditors

who should become parties thereto as parties of the third part. A creditor by signing would extend the time of the claim then held until January 1, 1925. The agreement by its terms was not to go into effect unless signed by creditors holding 75 per cent in amount of the debts of the company, excluding the "gold notes."

Although not signed by creditors representing the required amount, the committee named began to function and made good faith attempts to have other creditors sign. This was by the consent of the majority stockholders and officers of the foundry company. Mr. Foshay was one of the committee. He resigned. Mr. Warner, president of the appellant bank, was one selected at the instance of Nye to take the place of one chosen from East St. Louis. An inventory was to be taken and an audit made by a firm of accountants acceptable to all parties. Even before the result of the inventory and audit was ascertained friction appeared, lack of co-operation, if not obstruction, being charged against C. W. Nye. When the inventory and audit were completed, the creditors' advisory committee and certain creditors concluded that former financial statements of the foundry company and representations made by the Nyes when credit was obtained had been untrue and misleading.

In the meantime suits by some creditors had been started, some claims had been paid which the trust company and other creditors deemed preferences, and the result was a filing on August 29, 1924, in the federal court of a petition by creditors who had executed exhibit D to have the foundry company adjudged an involuntary bankrupt and a receiver appointed to take charge of its property and business. The foundry company appeared and answered, denying insolvency. Trial of the issues was postponed in anticipation that the company would be able to obtain elsewhere the financial assistance needed. The trust company offered to accept 50 per cent of its claim in full satisfaction. After several continuances the foundry company, through its attorneys Frank J. Morley and J. P. Devaney, withdrew the answer, admitting their efforts to raise money to settle with the creditors or extricate the company from financial embar-

rassment had failed and thereupon on October 27, 1924, the foundry company was adjudged a bankrupt.

Afterwards and prior to a sale of the property and business by the trustee in bankruptcy efforts were made to compromise with the creditors. The latter signified a willingness to take less than 50 cents on the dollar. But no offer of compromise which could be made appeared satisfactory to the creditors. The sale was advertised. The trust company informed plaintiff that for its own protection it would make a bid for $250,000 for all the assets; and if the bid was accepted it would hold the property for the benefit of all the creditors. In the meantime some citizens of Shakopee headed by one Schroeder formed a syndicate to bid on the property. A bid of $250,000 for the property, exclusive of the cash and bills receivable, was made. The cash and bills receivable amounting to about $150,000, the Schroeder bid was the better and was accepted. The Schroeder syndicate incorporated and is the respondent range company. To finance the range company a trust deed was executed to the trust company. This deed was approved by the bankruptcy court. A line of credit was also extended by the trust company to the range company. No stock in the range company was or is held by the trust company or any of its officers.

[Theories of appellants]

One of the theories upon which appellants claimed a recovery or relief was a conspiracy on the part of the trust company, its officers, some of the principal creditors, the attorney selected by the advisory creditors' committee, and the attorney Moriarty, who was employed by the foundry company to contest its being adjudged a bankrupt, who before the adjudication withdrew as attorney but subsequently assisted in forming the Schroeder syndicate, drew the articles of incorporation of the range company, has since acted as the latter's attorney, and is a director and stockholder thereof. Another theory advanced was that the trust company, plaintiff and the other creditors entered a joint adventure when they began to plan to save the foundry company so as eventually to be able to collect their claims against it; and being in a common venture they occupied a fiduciary

relation to all concerned therein, and that somehow the trust company breached its duty and should respond in damages to the foundry company for the destruction of its business and the loss of its property. Another claim is that the trust company contracted to loan the foundry company $50,000 and breached the contract, resulting in damages to the foundry company. Again it is claimed that duress and fraud were used by the trust company and those connected with it, inducing the officers of the foundry company to enter into an arrangement which finally forced the company into bankruptcy. Another proposition urged is that the trust company having been a party to exhibit D was legally incapable of signing the petition for involuntary bankruptcy, and its so doing constituted an abuse of process rendering itself liable to the foundry company.

There is also a claim that the appellant bank as a creditor had a lien upon the bankrupt's property, that this was not divested by the bankruptcy adjudication brought about wrongfully by the trust company and its aids, and that it can now reach the property in the hands of the range company, since Moriarty who assisted in its organization and in the purchase of the foundry company's property obtained information of the worth and value thereof when acting as attorney for the foundry company, or in other words the range company is a trustee of the property ex maleficio.

### [Findings on material issues]

The court made findings anticipating that the parties might desire other additional or modified findings. Nearly 100 printed pages of amended findings were proposed. The court heard the parties and then drew the final findings, consisting of 17 printed pages, covering the basic issues quite fully. From these findings, the memorandum attached thereto, and the review of the issues and the legal conclusions given by the learned trial court when the evidence was all in, it is quite clear that every avenue of relief sought by appellants was fully appreciated and met by a proper finding. We shall attempt to set out the substance of those deemed decisive of the action, viz:

The foundry company was on May 1, 1924, and for some months immediately prior thereto, financially embarrassed and unable to

meet its current financial obligations as they matured. Because of this condition and the large interests plaintiff and the trust company had at stake in saving the foundry company from financial ruin, the three companies began negotiations in the latter part of April, 1924, and continued up to May 26, 1924, which had for their general purpose the agreement upon and execution of an amicable plan whereby the foundry company might be provided with sufficient additional working capital to carry on and meet its obligations. The features of this plan were forbearance of the trust company to enforce its claims, and the joint efforts to induce the other creditors to do likewise, the sale by plaintiff of additional special preferred stock of the foundry company in the amount of $100,000, and the advancement by the trust company, under certain conditions, of funds for current use to the foundry company of not exceeding $100,000. The details of the plan varied in the course of negotiations. The appellant bank took a minor part in the same. A feature of the plan was that the foundry company should not seek or accept of financial aid from other sources, the parties anticipating their plan would be successful. However no agreement of the character stated or such as is alleged in plaintiff's complaint, particularly in the 18th and 19th paragraphs thereof, was ever reached between the parties or between the trust company and any one of the parties above named. (Those paragraphs, the 18th and 19th, charge a fiduciary relation between plaintiff and the foundry company because of the sale of the special stock and a tripartite agreement between plaintiff, the foundry company and the trust company to save the business of the foundry company, which agreement is alleged to have been acted upon by the trust company until the sale of the property of the foundry company in the bankruptcy proceeding.) When on May 26, 1924, it became evident that plaintiff and the trust company could not reach an agreement upon the plan mentioned, plaintiff withdrew from further negotiations in respect thereto and such negotiations were not thereafter resumed between the parties. Other plans however to save the business of the foundry company were thereupon considered by the trust company and all the appellants, but no agreement was reached other

than as embodied in exhibit D, hereinafter referred to.  Otherwise than as above set forth, the evidence establishes no facts which disclose a fiduciary relationship between plaintiff, the foundry company, the trust company, the appellant bank, or any of the officers of said corporation either individually or as officers, either as alleged in the complaint, in the answers, or in the cross-bills arising out of any agreement or joint enterprise existing prior to the execution of exhibit D.

[Exhibit D]

From the foregoing the court deduced as a conclusion of law that no fiduciary relationship existed between the trust company and the other parties to the action or between the trust company and any one of them prior to or aside from exhibit D.  It is then found that on or about June 16, 1924, plaintiff, the foundry company, the appellant bank and other interested parties entered into exhibit D, dated May 26, 1924, which agreement never became fully operative for the reason that it was never signed by creditors holding 75 per cent of the debts of the foundry company.  On or about June 17 plaintiff abandoned and renounced exhibit D and about July 20 the appellant bank did likewise, and neither was thereafter a party thereto.

The court finds that pursuant to exhibit D the advisory committee of five was selected, consisting of Niedringhaus, Maclaren, Barnes, a vice-president of the trust company, W. B. Foshay, and Warner, the president of appellant bank.  Niedringhaus, Barnes, and Maclaren, or their proxies, constituting the majority, acted in concert and controlled when substantial differences of opinion arose as to the conduct of affairs.  On June 16 Maclaren was selected as chairman and Kay Todd as legal adviser, both of whom acted as such until August 29, 1924.  In the dealings of the committee with the foundry company the latter was represented by C. W. Nye.  Almost as soon as organized there developed between the members of the committee an attitude of mutual suspicion.  At no time was there a relation of actual and mutual trust between the majority and Foshay, Warner and Nye or either of them.  All of the last three consented to exhibit D with reluctance, and only because the representatives of the trust company and certain other large creditors

of the foundry company, and especially Maclaren, refused to co-operate to save the business of that company on any terms which were proposed between the interested parties other than those set forth in exhibit D. From the organization of the committee until the latter part of August the majority of said committee and its attorney diligently and in good faith endeavored to secure the consent of creditors to exhibit D, and the failure to secure such consent was not due to their fault. Pursuant to exhibit D the foundry company delivered a list of its creditors to the committee, permitted one Craig to enter the establishment as executive officer representing the committee, and one Rolfe to supervise an inventory to be taken of the Shakopee plant, and permitted Marwick, Mitchell & Company, accountants selected by the committee, to make an audit of its books. The court found that at no time prior to the filing of the petition in bankruptcy, hereafter referred to, was said list of creditors used for any other purpose than to secure the consent of creditors to exhibit D; that Craig did not conduct himself to the detriment of the foundry company, and that the trust company, its officers, agents, or associates did not instruct or encourage Rolfe or Marwick, Mitchell & Company, or either of them, to do otherwise than ascertain and report the true facts concerning the business of the foundry company as ascertained by them.

In the months of July and August, 1924, C. W. Nye, who continued to act for the foundry company in the dealings with the committee, became increasingly hostile and refused in substantial respects to co-operate with it to conform to the terms of exhibit D. During said months Rolfe and Marwick, Mitchell & Company submitted reports of their findings, which so far as disclosed by the evidence were submitted to and considered by the committee in good faith and tended to show that the assets of the foundry company were substantially less and its financial condition substantially worse than the same had been represented to be prior to and during the negotiations above referred to, the signing of exhibit D, and the steps taken to carry it into full effect. The audit was submitted to the committee about August 18, but was not exhibited to appellants

prior to the filing of the petition in bankruptcy. A reasonable time for the continuance of efforts by the committee to secure the consent of creditors to exhibit D was found to have expired prior to August 29.

Exhibit D is too lengthy to set out in extenso. A few of the provisions may be referred to. Each creditor signing agreed to extend the claim so as to mature it on December 31, 1924, and to give a further provisional extension not exceeding six months. The foundry company was not to pay any claim in the meantime without the consent of the committee. The foundry company was to select an executive officer to manage the business subject to the control of the committee. Craig was so selected. The committee was given power to appoint attorneys and agents to make investigation of the affairs of the company. In case of violation of any terms of the agreement by the foundry company, then its obligations to the creditors should at once become due. Good faith was required of all parties to the compact. This provision is quoted:

"This agreement shall go into effect when signed by the Company and by or on behalf of such number of the Creditors as shall be satisfactory to the Committee (but in no event unless signed by Creditors holding seventy-five per cent in amount of the debts of the Company, not including the five year gold notes dated June 1, 1923), and the Committee shall thereupon declare the agreement in effect."

The court from the foregoing facts reached the conclusion of law that exhibit D, either on its face or as practically construed by the conduct of the parties thereto, imposed upon the trust company no other obligation than to proceed with good faith and reasonable diligence for a reasonable time to endeavor to secure the assent thereto of the proportion of creditors necessary under its terms to make it fully operative; to use good faith and reasonable diligence to see that the agents and representatives of the committee were honest and efficient in their dealings with the affairs of the foundry company; and to refrain from using the information obtained in

the course of the execution of the provisions of exhibit D to secure any secret advantage over the other parties thereto or any of them. That after June 17, 1924, and July 20, 1924, respectively, all duties owed by the trust company to plaintiff and to appellant bank, arising in any way out of exhibit D, wholly terminated; and on August 29, 1924, the trust company owed no duty to the foundry company, its stockholders, or the individual defendants which in anywise restricted its right to file a petition in involuntary bankruptcy against the foundry company on the same basis with any other creditor.

[Range company]

The court also found that the range company was not organized by the trust company or for its benefit; that the title of the range company to the property purchased from the trustee in bankruptcy is not held for the benefit of the trust company; that the range company is not and has not been a cover or secret agent for the trust company or other than an individual corporate entity. The court expressly found that no conspiracy existed between the trust company or any of its officers or agents and the range company as alleged in the complaint and cross-bills, or otherwise, to destroy the foundry company and get possession of its assets.

[Dismissal as to trust company and range company]

The court also concluded that, in view of the findings made, no other facts relative to which evidence was received were material or appropriate to be found, particularly so as to what occurred subsequent to the filing of the petition in involuntary bankruptcy. In the court's opinion such facts were material only for their evidentiary bearing upon the issues determined in the findings made. The final conclusion of law was that the trust company and range company are entitled to judgments of dismissal on the merits with costs against appellants and that none of the latter are entitled to any relief.

[New trial unnecessary]

We do not intend to note isolated rulings excluding or admitting evidence over objections. It is enough to say that in so far as such evidence tended to prove conspiracy, joint adventure, fiduciary relations, want of good faith, fraud, duress, breach of trust, the exist-

ence of agreements and violations thereof, it was admitted with the utmost liberality to appellants. In respect to documentary evidence, inventories, books of account, and estimate of values, objections grounded upon want of foundation, immateriality, or irrelevancy generally were disposed of according to settled rules of evidence, except that time and again such evidence was received if it had any bearing upon the issues involving misconduct of respondents. We have been directed to no ruling on the trial, and have found none, which warrants granting a new trial.

[Findings on immaterial issues]

Appellants insist that they were entitled to have a finding upon the various issues requested. True it is that in an action tried to the court findings should be made upon every ultimate material issue in the case. But the ultimate issuable facts alone need be found. Hayes v. Hayes, 119 Minn. 1, 137 N. W. 162. "It is necessary that the court make findings upon every material issue of fact, the determination of which is necessary to sustain its judgment," is the language in Gross Iron Ore Co. v. Paulle, 132 Minn. 160, 165, 156 N. W. 268. "As a general rule findings should cover all the issues of fact, but the court is not required to pass upon issues not determinative of the case, the rule being that the findings should be sufficient to authorize the judgment entered." In re Assessment for Paving Mississippi River Blvd. 169 Minn. 231, 233, 211 N. W. 9. There can be no question but that the findings made justify and sustain the judgment ordered. They are determinative of the case. If the evidence sustains them none of appellants could have any relief in law or equity.

We shall note a few of the issues of fact which appellants particularly direct attention to and assign as error the refusal of the court to make specific findings thereon, viz: The solvency or insolvency of the foundry company in August, 1924; the abuse of process by the trust company in joining in the petition filed to have the foundry company declared a bankrupt; the taking of the title to the property of the foundry company by the range company as trustee ex maleficio; and the existence of an agreement on the part

of the trust company to finance the foundry company to the extent of $50,000. Enough of the findings above set out clearly show that no binding agreement was ever made after April, 1924, by the trust company to loan or finance the foundry company to any extent. Every plan was tentative depending on conditions that never were fulfilled. Since the findings made negative the existence of fraud, duress, abuse of process, wrongdoing, misconduct and breach of contract on the part of the trust company causing the bankruptcy, it would seem that the purchaser from the trustee in bankruptcy acquired good title to the property of the foundry company and that neither its stockholders nor creditors can reclaim either the property from the range company or assert a lien thereon. Whether Moriarty's connection with the latter company can in law make it a trustee ex maleficio, holding the property for the use of the foundry company, will be considered hereafter. There was no express find-ing upon the question of the solvency of the foundry company when the petition in involuntary bankruptcy was signed and filed, in which petition the trust company joined. The trial court was of the opinion that the findings made were determinative of the case, and therefore the issue of solvency or insolvency became immaterial in this litigation; and also because of such findings, the adjudication in the bankruptcy court became final and here concluded appellants.

We think the trial court was right. The foundry company filed its answer denying insolvency in the bankruptcy court. It appeared by such attorneys as Frank J. Morley and J. P. Devaney to oppose the adjudication and the appointment of receivers. The record is clear that these attorneys did everything which honorably could be done to obtain the financial aid needed to avoid the adjudi-cation of bankruptcy. To the same end the federal court post-poned the hearing. The creditors, including the trust company, stood ready to accept 50 cents on the dollar of their claims and less. The foundry company with the aid of plaintiff never was in position to offer a settlement approaching that basis. Finally the attorneys of the foundry company withdrew the answer, and the adjudication followed. The evidence discloses that attorneys repre-

senting plaintiff and the appellant bank appeared in the bankruptcy court to oppose the adjudication and knew what was going on there. Under those circumstances and the facts found, as above indicated, it should follow that the adjudication conclusively determined as to all appellants that the foundry companay was insolvent on August 29, 1924. And since the findings made completely and absolutely determine against appellants every ultimate issue of fact upon which any one of them possibly could predicate a claim of right to a judgment for damages or relief of any sort, other issues raised by the pleadings or the evidence, such as insolvency of the foundry company, the actual value of its assets including good will, the amount of its liabilities, the value of the business and property of the range company at the time of the trial or at any time previous, have become immaterial, and the trial court was not required to make findings thereon.

It is said the trial court was confused and made findings in segments. No one can read the incisive statement of the issues of fact and law involved in the case made by the court near the close of the trial and justly claim confusion of mind or failure to grasp the vital issues. The court made such statement so that counsel could better present what evidence they still deemed needful and also marshal their authorities and deliver their final arguments more effectively. The statement is found on pages 4539 to 4546 of the printed record.

### [Joint adventure]

The argument is insistently made by all of the appellants that prior to the signing of exhibit D, and apart from it, a joint venture had been entered upon by the trust company with appellants which created a fiduciary relation. The court found to the contrary. To us the situation of the parties, their conduct, as well as the oral and written evidence, demonstrate the absence of anything bordering a joint venture. Plans for aid were considered. Writings were prepared. But the plans were not and could not be put in operation, mainly because neither plaintiff nor the foundry company nor the appellant bank could or would do the part each was

to do. Neither were any of the written agreements prepared by the attorneys on May 12 signed or executed by the trust company or any other party. None of the plans devised or formulated contemplated any venture for profit either to plaintiff, the appellant bank, or the trust company. The sole inducement for the two latter financially to aid the foundry company was so that it perchance might after a time be able to pay them what it justly owed, and plaintiff's object was that the foundry company might be able to take care of the stock plaintiff had sold on the representation that it was a safe investment. It seems to us a misuse of legal terms to say that, when a creditor plans to extend or does extend financial aid or forbearance to a distressed debtor in the hope that the latter will eventually be able to pay the debt, the two thereby engage in a joint adventure and fiduciary relations result. Furthermore, prior to May 26, 1924, the trust company took over no property of the foundry company, either alone or in connection with any other party, interfered with or controlled none of its business; hence no relief to the foundry company, or to anyone claiming through it, could be bottomed upon the principles which warranted redress in King v. Remington, 36 Minn. 15, 29 N. W. 352, or in Minneapolis Trust Co. v. Menage, 73 Minn. 441, 76 N. W. 195.

### [Loan to foundry company]

Plaintiff urges the existence of an alleged contract of the trust company to lend the foundry company $50,000, and a breach thereof. It is enough to say that no such contract is alleged in any pleading, and the evidence does not call for a finding that such contract was either made or breached. It is almost absurd to think of the possibility of its having been made under the situation existing. For such a supposed unilateral contract we look in vain for a legal consideration.

### [Gold notes]

There were allegations in plaintiff's complaint concerning the "gold notes" issued by the foundry company and underwritten and sold by the trust company under a trust agreement recorded in the office of the register of deeds in Scott county, Minnesota. It is

claimed that the purpose was to use this means of depriving the foundry company of its property, inducing it to expand and lead it into financial difficulties that finally gave the trust company the chance to force it into bankruptcy. Plaintiff and the other appellants insist that this agreement gave rise to a fiduciary relation which made any participation by the trust company in the bankruptcy proceedings liable in damages to the foundry company. The court found that no fiduciary relation was created by the transaction relative to the underwriting and sale of the "gold notes" which in and of itself restricted the right of the trust company to join in the filing of the bankruptcy petition. The court was right. Not the slightest evidence of wrongdoing, overreaching, or evil intent is to be found relative to these "gold notes" or their sale by the trust company. Whatever the agreement was, no property of the foundry company was taken or interfered with in virtue thereof; and the King v. Remington case, 36 Minn. 15, 29 N. W. 352, has no application.

[Trust company released from liability]

Is there anything in exhibit D, or the part which the trust company took in what was done pursuant thereto, which could make it liable to any appellant? The plan proposed by the creditors at the meeting of May 26, 1924, of having a creditors' advisory committee take temporary charge jointly with the foundry company of its business, was provisionally put in operation by the execution in the middle of June of the tripartite agreement, exhibit D, by the foundry company, by the five members of the committee selected, and by some, but not enough, of the requisite creditors in amount to give it full effect. We cannot determine from the printed record or the exhibits produced in this court whether exhibit D was signed by the appellant bank. Plaintiff was not strictly a creditor, and the exhibit does not indicate that plaintiff should be a party thereto. But the chief officers of both plaintiff and the appellant bank were members of the committee and as such executed the same. It may therefore be properly claimed that the corporations of which they were the head should be the beneficiaries of exhibit D. The court

found, and the evidence sustains the finding, that both of said appellants withdrew from and abandoned exhibit D prior to August, 1924. It cannot be that after such action either is in a position to invoke the doctrine of fiduciary relations against other parties to the document so as to prohibit them from pursuing such lawful course as was open to them had the document not existed. By abandoning and withdrawing from an agreement, as parties or as beneficiaries, which had not gone into full effect for lack of signatures, they necessarily concede to other tentative parties the exercise of the same privilege. In so far as the parties proceeded under exhibit D in anticipation of its complete execution the parties were necessarily in a fiduciary relation to each other. The express findings of the court are to the effect that the trust company, its officers, attorneys and agents, in good faith endeavored for a reasonable length of time to procure the required signatures of creditors to exhibit D to put it in full effect, that such reasonable time expired prior to August 29, 1924, and as a conclusion of law found that on the last named date the company was as free to join in filing the bankruptcy petition as any creditor who had not signed exhibit D or had taken no part in any negotiation to aid the foundry company.

The findings, as above more fully set out, indicate that not only had plaintiff and the appellant bank abandoned the agreement, but that the foundry company had not disclosed its true condition to those trying to save it, and that if its true condition had been known exhibit D likely would not have been drawn or signed. The findings also are to the effect that the foundry company had broken its engagement under exhibit D so as to justify the creditors who had signed it to withdraw therefrom. With this document in the form it was—not to become irrevocable until the required signers had been procured—it cannot be held otherwise than that the fiduciary relations assumed by those who provisionally acted thereunder continues only while so acting, and when it failed to become effective it ceased to bind so that the creditors who had signed became as free to protect their rights by all legal means as if they had never signed. Exhibit D so provided. We therefore agree with the court below that no fiduciary relation growing out of exhibit D or

prior transactions stood in the way of the trust company's joining in the involuntary bankruptcy petition filed on or after August 29, 1924.

[Insolvency of foundry company question for federal court]

Such being our conclusion, there could be no abuse of process claimed in filing the petition. But assuming the law to be that a creditor who has signed such an instrument as exhibit D is barred from petitioning to have the debtor adjudged an involuntary bankrupt, the petition on its face disclosed that fact. It therefore became a question to be raised in the bankruptcy court. Not having been so raised by appellants, who were represented there, they are now foreclosed. The matter of solvency or insolvency of the foundry company was also for that court, and its adjudication should be binding upon that issue in the absence of fraud, conspiracy, duress or collusion, of which there is no evidence warranting a finding in favor of any of appellants.

[Range company not a trustee ex maleficio]

The claim is made that the evidence warrants findings that the range company took title to the property as a trustee ex maleficio for the use of the foundry company. This proposition is based upon the fact that the company employed the attorney Moriarty of Shakopee as one of its counsel to answer the bankruptcy petition denying insolvency, but who withdrew from the case before the hearing, no objection being raised to his so doing by either the client or associate counsel. Moriarty afterwards, when the trustee in bankruptcy advertised for bids on the bankrupt estate, became active in forming the Schroeder syndicate, the successful bidder, drew the articles of incorporation of the range company which took over the bid, and has been a stockholder, director and attorney of the company since. It is claimed that because he and one Rolfe, who was employed by the creditors' advisory committee to take the inventory of the foundry company, also at one time interested in the Schroeder syndicate, by their position and knowledge so affected the bid and transfer that in law the title vested in the range company as trustee ex maleficio for the use of the foundry company,

its various shareholders, and creditors, whose debts have not been satisfied in the bankruptcy proceeding.

We do not think this conclusion should follow. There was nothing in Rolfe's position or conduct to taint the Schroeder syndicate bid. As to Moriarty, the evidence does not show any connection with any party to this suit from the time he withdrew as attorney for the foundry company until the trustee advertised for bids. He with the rest of the citizens of Shakopee was interested in retaining for the town the business to be sold. He took an active interest in forming the Schroeder syndicate for the purpose of bidding upon the property. Moriarty had had no part in any act leading up to or contributing to the bankruptcy of the foundry company. Neither the company nor anyone else objected to his severing his connection as attorney of the company when he did. He was not in any fiduciary or confidential relation to the foundry company and had not been for over two months when he became active with the other Shakopee residents in the matter of bidding at the trustee sale. Counsel cite Arnold v. Smith, 121 Minn. 116, 140 N. W. 748, in addition to King v. Remington, 36 Minn. 15, 29 N. W. 352, and Minneapolis Trust Co. v. Menage, 73 Minn. 441, 76 N. W. 195, but it is to be noted that Moriarty's employment had ceased long prior to the formation of the Schroeder syndicate, no property of the foundry company had ever been in his keeping, nor had he any duty to perform for any of appellants in regard to the property which was to be sold, nor did his employment relate to a sale of the property or to any duty in respect thereof in case of an adjudication of bankruptcy of the owner.

The facts are not at all parallel to those in Trice v. Comstock, (C. C. A.) 121 F. 620, 61 L. R. A. 176, cited by appellants. Had Moriarty been under any duty to bid in the property for the foundry company or any client the rule claimed by appellants would have applied. We fail to find any legal objection to Moriarty's activities in participating in the formation of an organization for the purpose of bidding for the property the trustee of bankruptcy was required to sell under the direction of the court. No secret

advantage was sought. The sale was open to all and made under the supervision of the court. No misconduct of Moriarty or Rolfe, nor of the trust company, its officers, attorneys or agents, nor of anyone else, except the mistakes of business judgment of the foundry company and its managers, brought on the bankruptcy. There was therefore no defect in the trustee's title to the property and no existing right, secret or otherwise, on the part of appellants or any creditor or lien claimant of the foundry company to question the fact that the bankruptcy adjudication passed the absolute and complete right, title and interest of all the foundry company's property to the trustee. Hence there existed no fact or circumstance inimical to that title knowledge of which could be imparted to the associates of Moriarty or Rolfe in the Schroeder syndicate.

We are of the opinion that neither the facts found nor the evidence justify findings of fact or conclusions of law to the effect that the range company is a trustee ex maleficio of the property transferred to it by the trustee in bankruptcy. It is not amiss to call attention to the fact that appellants have not let matters go by default. While acceptance of the Schroeder syndicate bid was pending the foundry company employed other attorneys of high professional standing and ability to have vacated the adjudication of bankruptcy. A hearing was had, and when the application was denied there was an appeal to the United States circuit court of appeals of the eighth circuit, where the decision of the court below was affirmed in August, 1925. Surely the foundry company and its stockholders have had their day in court upon the issue of insolvency, and also upon the legal question whether or not the trust company properly could join in the petition for involuntary bankruptcy—the petition on its face disclosing exhibit D.

**[No reason for charging any party with intentional wrong]**

Many of the questions raised by appellants, discussed both pro and con and fortified by numerous authorities, we do not reach. Every party to this litigation and the agents, officers and attorneys thereof have been charged by some one of the other parties with corrupt motives and malicious intentional wrongs in every move

made. The facts found virtually are to the contrary so far as respondents are concerned, and that disposes of the case upon simple legal principles needing no further discussion. A reading of the record with an open mind leads to the conclusion that there is no occasion to attribute an intentional wrong to any person or party concerned. The difficulty the foundry company found itself in was principally due to poor business judgment in too much expansion on borrowed capital; and plaintiff, the trust company, the appellant bank and the other creditors perhaps also displayed poor business judgment in extending more credit and forbearance to the company than its business and assets warranted. Everyone is prone to overestimate his possessions. So did the Nyes, and that no doubt accounts for the extravagant salaries drawn by them when so hard pressed for funds that some of the property of the company was allowed to be sold for taxes. Self-interest prompted the trust company, equally with each appellant, to direct every effort to keep the foundry company from bankruptcy if possible. And it seems to us that every plan proposed and attempted had this in view, and so far as the trust company was concerned was honestly and in good faith pursued, until by the inability or unwillingness of others to co-operate further progress became impossible.

The order denying the several motions of each appellant for a new trial is affirmed.